815 A.2d 1029 (2003)
357 N.J. Super. 515
NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, Plaintiff-Respondent,
v.
M.F. and M.M., Sr., Defendants-Respondents.
In the Matter of the Guardianship of B.F., M.M., Jr. and S.M., Minors.
Superior Court of New Jersey, Appellate Division.
Argued December 16, 2002.
Decided February 20, 2003.
*1031 Phyllis G. Warren, Assistant Deputy Public Defender, argued the cause for minor-appellant S.M. (Yvonne Smith Segars, Public Defender of New Jersey, attorney; Ms. Warren, of counsel and on the brief with Cynthia McCulloch Di Leo).
Cynthia A. Phillips, Deputy Attorney General, argued the cause for respondent Division of Youth and Family Services (Peter C. Harvey, Acting Attorney General of New Jersey, attorney; Michael Haas, of counsel; Ms. Phillips, on the brief). Vincent J. Gaughan, argued the cause for respondent M.F. (Mr. Gaughan, on the brief).
Before Judges HAVEY, A.A. RODRIGUEZ and WELLS.
*1030 The opinion of the court was delivered by HAVEY, P.J.A.D.
The law guardian, on behalf of S.M., a minor, appeals from a judgment dated March 27, 2002:(1) awarding the Division of Youth and Family Services (Division) *1032 legal custody of S.M.; (2) awarding physical custody of S.M. to S.F., her great aunt; and (3) terminating S.M.'s weekend visitation with her foster parents, M.P. and E.P. On appeal, the law guardian argues that the trial judge: (1) violated the Federal Adoption and Safe Families Act of 1997, 42 U.S.C.A. § 672-679, by rejecting the Division's initial permanency plan "without good cause," and by not complying with the time strictures of the act; (2) committed reversible error by applying the "serious and enduring harm" standard, rather than the "best interests" test; (3) erred by applying the presumption which favors placement of a child with relatives; and (4) failed to consider S.M.'s emotional distress or her "somatic or behavioral problems."
We condense the extensive procedural history and the Division's involvement with S.M. and her family for the purpose of addressing the law guardian's contentions. On July 24, 1998, M.F. gave birth to S.M.[1] The Division already had custody of M.F.'s son, B.F., born on August 22, 1995. Because of reports of abuse, the Division had filed a Title 9 action on November 26, 1997, charging M.F. with abuse and neglect, and by order also dated November 26, 1997, the trial judge awarded legal custody of B.F. to the Division.
In August 1998, B.F. was returned to M.F.'s custody with the Division's consent. However, on January 19, 2000, the trial judge granted the Division's application to remove both S.M. and B.F. from M.F.'s custody, finding that M.F. had failed to bring the children to day care, failed to obtain medical treatment for S.M., and had permitted the children to reside in M.F.'s grandmother's house which, the judge observed, was "not the greatest environment." The children were initially placed in an emergency shelter and ultimately, on February 23, 2000, placed in the custody of foster parents, M.P. and E.P.
During a March 2, 2000 case management conference it was reported that B.F. had been acting violently toward his foster mother. The judge directed M.F. to provide him with a list of relatives who may be willing to take custody of the children. The judge also denied the law guardian's application for a permanency hearing pursuant to N.J.S.A. 30:4C-61.2, finding that the children were not sufficiently adapted to their new placement to warrant such a hearing.
Dr. Charles F. Martinson, a court-appointed psychologist, conducted two evaluations of M.F. and in reports dated April 4, 2000 and June 23, 2000, concluded that M.F. was not presently, or in the near future, capable of caring for the children. On April 14, 2000, B.F. was accepted into a therapeutic foster-care program because of his continuing violent behavior.
During therapy sessions, M.F. expressed a desire that S.M. be placed with S.F., S.M.'s maternal great aunt. On May 10, 2000, the Child Placement Review Board recommended either the children's reunification with their biological parents or termination of parental rights, followed by adoption. The trial judge accepted these recommendations. On May 18, 2000, the judge denied the law guardian's second application for a permanency hearing.
On May 31, 2000, S.F. indicated a willingness to care for both children. S.F. was a single parent with two children, a homeowner, and employed as a certified medical assistant earning $38,000 a year. In July 2000, a case worker with The Children's Home Society reported that S.F. could not be recommended as a viable placement for the children because S.F. *1033 failed to recognize B.F.'s violent behavioral characteristics or M.F.'s inability to provide adequate parenting.
On July 31, 2000, M.F. gave birth to a son, M.M., Jr. By order dated August 4, 2000, the trial judge awarded physical custody of M.M., Jr. to S.F., subject to the Division's supervision. By report dated October 2, 2000, Dr. Martinson advised the Division that:
it would be clinically unwise to place either of these two children [S.M. and B.F.] with [S.F.] at this time. I say this out of respect for the children's current placement and the emotional difficulties each would sustain if their respective placements were disrupted at this time. My recommendation is not made because I feel that [S.F.'s] parenting skills are wanting or out of any suspicion for her motives. Indeed, in my discussion with [S.F.], I was persuaded that she has greater insight into [M.F.'s] shortcomings as a parent and into the emotional needs of [S.M.] and [B.F.]. However, I do feel that [B.F.] continues to display symptoms of serious psychopathology and that his emotional needs are unlikely to be met outside of the specialized setting where he now resides. The record indicates that [S.M.] had made enormous emotional progress in her current foster placement although that progress has been painstakingly slow. My clinical sense is that substantial erosion of those clinical gains can be expected if [S.M.] must now transition to a new residential placement.
On January 4, 2001, the trial judge ordered the Division to arrange for supervised visitation between S.F., S.M. and S.M.'s foster parents to determine whether S.M. could handle the transition to S.F.'s care and custody. On February 2, 2001, the Division filed its first permanency plan. It recommended that the children be adopted by their respective care givers, namely S.M. by the foster parents, M.M., Jr. by S.F., and B.F. by his therapeutic foster parents. The law guardian concurred with this plan. During a permanency hearing conducted on February 6, 2001, the trial judge rejected the Division's plan. He expressed concern regarding S.M., observing:
[S.F.] came before this Court . . . [in] July, [or] early August . . . [when S.M. had] . . . only been in this foster placement for approximately nine months. Had the Division acted with some deliberation... the emotional ... problems that she would suffer would've been somewhat lessened. I've got a real concern that there hasn't been any efforts to keep [S.M.] with her sibling [M.M., Jr.], and with the maternal aunt [S.F.].
....
I have some real concerns that the Division hasn't done all that it should've done to make it happen. Instead, they've taken the comfortable position of leaving the child in foster care for over eight or nine months....
The judge then directed the Division to modify its plan to include concurrent planning with the maternal aunt (S.F.), and further ordered that no termination complaint could be filed for six months.
Additional reports were received by the trial judge from Dr. Martinson and Dr. Alan S. Gordon, the parties' mental health professional, addressing the effect of removing S.M. from her foster parents, and the benefits of S.M. residing with her younger brother, M.M., Jr., and S.F. After S.M.'s four weekend visitations with S.F., Dr. Gordon reported that S.M. "would have little difficulty living with [S.F.]. She is certainly bonded to her." During a status conference conducted on August 22, 2001, the Division agreed with Dr. Gordon that S.M. was capable of making *1034 the transition from foster care to S.F.'s custody. The foster parents objected, expressing concern for S.M.'s welfare. Giving praise to the foster parents' efforts, the trial judge nevertheless accepted Dr. Gordon's findings and instructed the doctor to advise S.M. of the transition.
On October 2, 2001, over the law guardian's objection, the Division revised its permanency plan and recommended adoption of S.M. by S.F. Dr. Gordon submitted a supplemental report dated December 10, 2001, in which he concluded that S.M. "is being well cared for" by S.F. He further stated in his report that:
[S.F.'s] home was in order and that there was a school next door.... Ms. Crespo [the Division case worker] stated that [S.M.] appeared to be happy and was watching cartoons. Ms. Crespo had very positive statements to make concerning [S.F.] and her care of [S.M.].
However, he recommended that the "transitional period" be extended and that S.F. and the foster parents "work through" their mutual hostilities in the best interest of S.M. The law guardian persisted in her objection to the transition, noting the "serious issues" reported by the foster parents regarding S.M.'s emotional difficulty in adjusting to living with S.F.
Dr. Ronald W. Kelber, a psychologist, rendered a report dated February 23, 2002, opining that S.M. had "developed a close loving relationship with [the foster parents] and [S.F.]." However, he recommended that the foster parents be given custody.
The trial judge conducted a second permanency hearing for S.M. on March 15, 2002. Over the law guardian's objection, the judge ruled that the foster parents and S.F. would not be allowed to testify because of their "questionable" credibility arising out of their self-serving and conflicting positions. The judge nevertheless received the foster parents' written statement and limited testimony outlining the reasons why custody of S.M. should not be changed. Moreover, Dr. Kelber testified, repeating his opinion that placement of S.M. with the foster parents was in her best interest. However, he admitted that removal from the foster parents' care would not cause irreparable harm to S.M., and that a substantial bond existed between S.F. and S.M. A Division caseworker testified that S.M. was very comfortable, happy, healthy and well cared for in S.F.'s home and was "very attached to [her younger brother M.M., Jr.]."
In his lengthy and well-reasoned opinion, the judge held that it was in S.M.'s best interests to be placed in S.F.'s sole legal custody and that all overnight visitation with the foster parents should be terminated. The judge noted that it had "micro-managed this case from the inception" and therefore had "an in-depth understanding of all the issues." He then addressed all of the arguments set forth by the law guardian in her written summation, and reviewed all of the orders entered in the case, as well as the evidence admitted at trial.
In support of this decision, the judge found that S.M. had developed a "significant bond" with S.F. and had successfully "undergone the transition." The judge also found that S.M.'s relationship with M.M., Jr. should be preserved and that she would not be harmed if her relationship with the foster parents is terminated. The judge entered an order on March 27, 2002, awarding the Division legal custody and S.F. exclusive physical custody of S.M., terminating the foster parents' weekend visitation, requiring S.M.'s therapist to assist and arrange for closure between S.M. and her foster parents, and denying the law guardian's request for a stay pending appeal.
*1035 We affirm substantially for the reasons expressed by Judge Council in his comprehensive oral opinion rendered on March 20, 2002. The judge's factual findings are supported by substantial credible evidence in the record as a whole, Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484, 323 A.2d 495 (1974), and his conclusions, based on those findings, are legally sound. However, it is necessary to address the procedural arguments raised by the law guardian on appeal.
The law guardian first argues that the judgment must be reversed because the initial permanency hearing was not conducted within twelve months after placement, pursuant to N.J.S.A. 30:4C-61.2a(2). We reject the argument.
The Adoption and Safe Families Act of 1997 ("ASFA") conditions the receipt of certain federal funds on a state's implementation of a case review system for each child receiving foster care under supervision by the state. 42 U.S.C.A. §§ 670-679. The legislative history of the ASFA reflects an intent to "avoid unnecessary and lengthy stays" in the foster care system and to:
promote[ ] stability and permanence ... by requiring timely decision-making in proceedings to determine whether children can safely return to their families or whether they should be moved into safe and stable adoptive homes or other permanent family arrangements outside the foster care system.
[Strengthening Abuse and Neglect Courts Act, Pub.L. No. 106-314, § 2(3), 114 Stat. 1266 (2000).]
In that regard, a "case review system" is defined, in relevant part, in 42 U.S.C.A. § 675(5)(C), to mean a procedure for assuring that:
with respect to each such child, procedural safeguards will be applied ... to assure each child in foster care under the supervision of the State of a permanency hearing to be held, in a family or juvenile court or another court ... of competent jurisdiction ... no later than 12 months after the date the child is considered to have entered foster care....

[Emphasis added.]
In 1999, the Legislature amended Title 9 and Title 30 to conform with ASFA. For example, it amended the Child Placement Review Act (CPRA), N.J.S.A. 30:4C-50 to -65, to provide that:
it is in the public interest, whereby the safety of children shall be of paramount concern, to afford every child placed outside his home by the Division of Youth and Family Services with the opportunity for eventual return to his home or placement in an alternative permanent home; that it is the obligation of the State to promote this end through effective planning and regular review of each child's placement; and that it is the purpose of this act to establish procedures for both administrative and judicial review of each child's placement in order to ensure that such placement ensures the safety and health and serves the best interest of the child.

[N.J.S.A. 30:4C-51.]
CPRA provides for review of the Division's permanency plan by the court, which shall make its "best interests" analysis based on the entire record, including the recommendations of the board, the Division, and other information, and which hearing "shall be held ... no later than 12 months after the child has been in placement." N.J.S.A. 30:4C-61.2a(2).
It is true, as the law guardian points out, that S.M. was placed in the Division's custody on January 19, 2000, and that on March 2 and May 18, 2000, the judge denied the law guardian's application for a *1036 permanency hearing. It is also true that the first permanency hearing was conducted on February 6, 2001, twelve months and seventeen days after placement. Nonetheless, such an inconsequential deviation from the twelve-month time period contained in N.J.S.A. 30:4C-61.2a(2) does not warrant reversal of the placement decision. First, neither the state nor federal statute mandates reversal in the event of noncompliance with the time limitations. Instead, the ASFA provides for a graduating series of reductions in a state's funding eligibility. 42 U.S.C.A. § 672.
More importantly, decisions regarding the placement of a child under both the federal and state acts must ensure the safety and health of the child and serve in the child's best interests. 42 U.S.C.A. § 670; N.J.S.A. 30:4C-51. In that regard, reversal, for technical noncompliance, would violate the express purpose of the acts and is thus inappropriate. See, e.g., In re Guardianship of J. R., 174 N.J.Super. 211, 221-25, 416 A.2d 62 (App.Div.) (the Division's failure to fulfill its statutory duty by providing visitation to parent did not warrant reversal of decision terminating parental rights because best interests of child controlled), certif. denied, 85 N.J. 102, 425 A.2d 266 (1980).
The law guardian next contends that the trial judge violated ASFA statutory-time frames by rejecting the Division's initial permanent plan in which it recommended foster parent adoption of S.F. As noted, ASFA reflects an intention to "avoid unnecessary and lengthy stays" in the foster care system. See Strengthening Abuse and Neglect Courts Act, supra, Pub.L. No. 106-314, § 2.
However, balanced against the need for a timely resolution, is of course, the requirement that placement must serve in "the best interest of the child." 42 U.S.C.A. § 670; N.J.S.A. 30:4C-51. It is well established that it is the Division's policy to place children with relatives whenever possible. State, Div. of Youth and Family Servs. v. K.F., 353 N.J.Super. 623, 636, 803 A.2d 721 (App.Div.2002); In re E.M.B., 348 N.J.Super. 31, 34, 791 A.2d 256 (App.Div.2002).[2] To advance this goal "the court must have a broad discretion to evaluate and assess a relative's ability to care for children." K.F., supra, 353 N.J.Super. at 636, 803 A.2d 721. "Moreover, while [CPRA] no doubt vests wide discretion in both the Division and the Board to devise and recommend a plan, the trial court is not bound by it." State in the Interest of L.L., 265 N.J.Super. 68, 77, 625 A.2d 559 (App.Div.1993).
Here, although the Division considered S.M.'s needs and her bond with her foster family in its initial placement plan, it failed to consider whether S.F. would be an appropriate care giver for S.M., despite the fact that: (1) the Division had been aware of S.F.'s willingness to care for S.M.; (2) S.F. had had custody of M.M., Jr. since August 2000; and (3) S.F. was unquestionably qualified to parent. In that regard, the judge correctly determined that the Division had "not provided reasonable efforts to finalize the permanent plan" because it failed to consider whether S.F. would be an appropriate placement for S.M. Consequently, a final permanency hearing was premature.
In any event, ultimately the question is what was in S.M.'s best interest based upon the circumstances as they existed at the time of the final hearing conducted in March 2002. See In re Baby M., 109 N.J. 396, 456, 537 A.2d 1227 (1988) (in determining *1037 the best interests of the child, "we must look to what those best interests are, today, even if some of the facts may have resulted in part from legal error"). It was only at this point that the judge was able to make a meaningful "best interest" determination. We have no hesitancy in concluding that the trial judge was faithful to the overriding best interest standard in considering the facts and circumstances existing at the time of the final hearing, including the fact that the Division had revised its permanency plan.
The law guardian further argues that the trial judge erred as a matter of law in applying the wrong test; that is, in applying a presumption of relative placement and "the serious and enduring" harm test, as opposed to the best interests of the child. We do not agree.
In reviewing a child's placement, courts must determine whether "such placement ensures the safety and health and serves the best interest of the child." N.J.S.A. 30:4C-51; In re E.M.B., supra, 348 N.J.Super. at 52, 791 A.2d 256. Thus, "the `best interests' of the child is the polestar in the implementation of a placement plan." State in the Interest of L.L., supra, 265 N.J.Super. at 77, 625 A.2d 559. Here the judge specifically and repeatedly indicated that "[t]he standard for determination is the best interest of the child. And that's the standard that this Court uses."
Nevertheless, the law guardian argues that the judge in actuality applied a presumption in favor of relative placement. As the law guardian correctly points out, there is no common law presumption in favor of an award to a mother as opposed to a father, or to a relative as opposed to a third party, because such a presumption "might serve as a disincentive for the meticulous fact-finding required in custody cases."[3]Beck v. Beck, 86 N.J. 480, 488, 432 A.2d 63 (1981); State in the Interest of L.L., supra, 265 N.J.Super. at 77, 625 A.2d 559. Moreover, although there are statutory provisions in Title 30 and Title 9 which refer to relative placements, the statutes do not create a presumption in favor of such placement. See N.J.S.A. 9:6-8.54a (court may place child in custody of a relative, other suitable person, or the Division); N.J.S.A. 30:4C-12.1a (the Division "shall initiate a search for relatives who may be willing and able to provide the care and support required by the child"); N.J.S.A. 30:4C-60b (the Board shall recommend one of seven long-term goals including permanent placement with a relative).
The law guardian points to several references by the trial judge regarding the Division's responsibility to reunify the family and points out that references in Title 9 and Title 30 to reunification of the family refers to reunification of the child with the natural parents, not relatives. See N.J.S.A. 9:6-8.8b(2) and N.J.S.A. 30:4C-11.1b.
However, the Division is obligated to "initiate a search for relatives who may be willing and able to provide the care and support required by the child," N.J.S.A. 30:4C-12.1a, and the Division's policy is to place, whenever possible, children with relatives. K.F., supra, 353 N.J.Super. at 636, 803 A.2d 721. Moreover, the judge in fact did not apply a presumption in favor of relative placement, but instead applied the best interests of the child test. In reaching the determination to place S.M. with *1038 S.F., the judge considered the significant bond between S.M. and S.F., that S.F. was qualified to parent S.M. and the preservation of the sibling relationship between S.M. and M.M., Jr. There is no question, and the trial judge so found, that there was a strong bond between S.M. and her foster parents and that they had cared for and nurtured her. However, in applying the totality of the circumstances, the judge found that those factors were outweighed by the factors favoring placement with S.F., and thus it would be in S.M.'s "best interests" to be placed with her.
Next, the law guardian argues the judge erred in incorporating the "serious and enduring harm" standard, applicable to termination cases, into its application of the best interests of the child test. Under N.J.S.A. 30:4C-15.1a, the Division can initiate a petition to terminate parental rights on the grounds of the "best interest of the child" if four elements are met by clear and convincing evidence. The fourth prong provides that "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1a(4). "The question to be addressed under that prong is whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with her natural parents than from the permanent disruption of her relationship with her foster parents." In re Guardianship of K.H.O., 161 N.J. 337, 355, 736 A.2d 1246 (1999).
The law guardian argues that the judge improperly applied that test even though this was not a termination of parental rights case. We do not agree. As stated, here the judge repeatedly cited to and applied the best interests of the child standard in accordance with both Title 9 and Title 30, and did not refer to or apply the termination standards under N.J.S.A. 30:4C-15.1a(4).
We also reject the law guardian's argument that the trial judge erred in failing to assess the quality and significance of the respective bonds between S.M. and her foster parents, and S.M. and S.F. The "best interests" of the child "does not turn on whether the foster home is a `better' home, or the foster parents are `better' parents than the alternative home or family setting recommended by the Division." State in the Interest of L.L., supra, 265 N.J.Super. at 78, 625 A.2d 559. Instead, "the inquiry is whether the Division's proposed placement plan satisfies the legislative goals and objectives of the Act by providing a stable, safe and healthy environment for the child considering all of the circumstances surrounding the placement." Id. at 79, 625 A.2d 559. Here, the judge did not compare the families, but instead focused on a variety of pertinent factors in accepting the Division's ultimate permanency plan. For example, the judge focused on S.M.'s relatively seamless transition from foster care to the biological family. Moreover, the trial judge hardly disregarded the bonding between S.M. and the foster parents. Instead, he considered that factor, as well as many others, in determining the "best interests" of S.M.
We reject the law guardian's argument that the trial judge erred in failing to allow the foster parents to testify. It is true that initially, the judge opted not to permit the foster parents and S.F. to testify. Nevertheless, he ultimately allowed the foster parents to testify, and furthermore imposed no other limitations on the admission of evidence or the calling of witnesses. We find no error in the manner by which the trial judge conducted the hearing.
Nor do we find any merit in the law guardian's argument that the judge failed to consider or accord proper weight to the evidence of S.M.'s emotional distress.
*1039 Although there were some reports of S.M.'s emotional difficulties, Dr. Kelber conceded that the transition process, and not exposure to S.F., could be contributing to S.M.'s behavioral problems. Moreover, there was abundant evidence that S.M. in fact had difficulty separating from S.F. Dr. Gordon's report revealed that S.M. "started crying hysterically" when S.F. left S.M. in Dr. Gordon's office. Moreover, the trial judge cited Dr. Gordon's July 10, 2001 report, noting that the foster mother's statements about S.M. may not have been entirely objective. Ultimately, the judge carefully considered all of the evidence of S.M.'s emotional distress and, based upon the substantial evidence, expert and otherwise, concluded that S.M. was happy and well-cared for in the custody of S.F. and that S.M.'s bonding with S.F. and her younger brother M.M., Jr. was substantial.
We affirm the judgment adopting the Division's permanency plan. However, we were advised at oral argument that the trial judge's order terminating S.M.'s visitation with her foster parents was stayed pending appeal. We therefore assume that visitation has been ongoing. We remand for a determination as to whether termination of, or continued visitation, would be in the best interests of S.M.
NOTES
[1] S.M.'s father is M.M., Sr., a twenty-three year old unregistered person at the time of her birth. M.M., Sr. has not appealed from the judgment.
[2] Similarly, the Board reviews the Division's plan and recommends one of seven long-term goals including permanent placement with a relative. N.J.S.A. 30:4C-60b.
[3] A presumption of custody only exists in favor of a natural parent as opposed to placement with relatives or foster parents. Watkins v. Nelson, 163 N.J. 235, 246, 748 A.2d 558 (2000).