IN THE MATTER OF THE GUARDIANSHIP OF THE
PERSON AND ESTATE OF N.S., A MINOR.

MARIA L., PETITIONER, v. THE EIGHTH JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA, AND THE HONORABLE GERALD W. HARDCASTLE, RESPONDENTS, AND THE STATE OF NEVADA, DIVISION OF CHILD AND FAMILY SERVICES, DEPARTMENT OF HUMAN RESOURCES, REAL PARTY IN INTEREST.

No. 43919

IN THE MATTER OF PETITION FOR VISITATION
WITH N.S., A MINOR.

MARIA L., PETITIONER, v. THE EIGHTH JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA, AND THE HONORABLE GERALD W. HARDCASTLE, RESPONDENTS, AND THE STATE OF NEVADA, DIVISION OF CHILD AND FAMILY SERVICES, DEPARTMENT OF HUMAN RESOURCES, REAL PARTY IN INTEREST.

No. 45415

March 16, 2006                                          130 P.3d 657

---

*Beckley Singleton, Chtd.*, and *Daniel F. Polsenberg* and *Beau Sterling*, Las Vegas; *Clark County Legal Services Program, Inc.*, and *Barbara E. Buckley, Stephanie A. Charter*, and *April S. Green*, Las Vegas, for Petitioner.

*George Chanos*, Attorney General, and *Linda C. Anderson, Julie M. Sueoka*, and *Dennis C. Wilson*, Deputies Attorney General, Carson City; *David J. Roger*, District Attorney, and *Robert E. Griffy*, Deputy District Attorney, Clark County, for Real Party in Interest.

*Annette Ruth Appell*, Las Vegas, for Amicus Curiae Thomas and Mack Clinic.

*Crockett & Myers* and *Richard W. Myers*, Las Vegas, for Amicus Curiae Nevada Trial Lawyers Association.

*McCracken Stemerman Bowen & Holsberry* and *Kristin L. Martin*, Las Vegas, for Amicus Curiae Culinary Union.

Before MAUPIN, GIBBONS and HARDESTY, JJ.

## OPINION

By the Court, GIBBONS, J.:

These are consolidated original petitions for a writ of mandamus, challenging district court orders denying a maternal grandmother's petition for guardianship and petition for visitation with her minor granddaughter. We grant the petitions because the district court failed to comply with Nevada's abuse and neglect statutes, NRS Chapter 432B, by not ensuring that the grandmother, a relative with a special interest in the child, was involved in and notified of the placement plan before it granted custody of the child to the State, thereby depriving her of the benefit of the familial preference for placement. Further, the district court erroneously gave great weight to the foster parents' opposition to visitation over the other mandatory factors set forth in the visitation statute, NRS 125C.050. Accordingly, we grant the petitions.

### FACTS

Petitioner Maria L. is the maternal grandmother of N.S., the sixth and youngest child of Maria's daughter, Y.S. While incarcerated for prostitution, Y.S. gave birth to N.S. A toxicology report

indicated that Y.S. and N.S. tested positive for amphetamine and methamphetamine. Pending further proceedings, the district court placed N.S. into the protective custody of the real party in interest, the Division of Child and Family Services (DCFS). DCFS commenced a proceeding under NRS Chapter 432B, Nevada's abuse and neglect statute.

A few weeks after the protective placement, Child Protective Services (CPS) contacted Maria because Y.S.'s exact whereabouts were unknown. According to a CPS report, Maria discussed the fact that N.S. might be placed with DCFS. Maria was already taking care of Y.S.'s five other children, pursuant to a temporary guardianship signed by Y.S. Maria expressed to CPS her desire to keep her family together, especially for the children's sake, but was unsure of how she would care for another child. Maria did not say she could not take N.S. at the time, but because the caseworker believed Maria was taking care of too many children, the CPS report recommended that N.S. be placed elsewhere through DCFS.

Thereafter, the district court made N.S. a ward of the state and, based on the report submitted by CPS, granted custody of N.S. to DCFS for appropriate placement. DCFS immediately placed N.S. with a foster family. Only a few weeks later, the district court made Y.S.'s five other children wards of the state but granted custody to Maria. Since the initial placement, N.S. has lived continuously with the foster family, who subsequently expressed their desire to adopt the child. DCFS allowed Maria unsupervised visitation with N.S. while she was in the care of the foster family. Maria visited the child regularly and also brought the child's siblings for visits.

DCFS located Y.S. and devised a case plan for her with the permanency goal of reuniting N.S. with Y.S. The case plan required that Y.S. complete a domestic violence program and drug treatment. The plan further allowed supervised visitation between Y.S. and N.S. at the DCFS office. Concurrent with its efforts to reunite N.S. with her mother, DCFS also established adoption as the alternative permanency plan for N.S. in the event that Y.S. failed to comply with her case plan and reunification was not possible.

In the interim, when N.S. was approximately four months old, Maria petitioned the district court, in the abuse and neglect proceedings, to appoint her as the child's guardian. Around this time, the district court terminated the State's wardship over Y.S.'s five other children and awarded Maria legal guardianship. Maria secured a larger house and made other preparations necessary to accommodate her sixth grandchild. DCFS opposed Maria's petition, arguing that, based on CPS's initial meeting with Maria, she was "overwhelmed" by the responsibility of caring for Y.S.'s other children and could not care for another child. DCFS also ex-

pressed concern about Maria's ability to protect N.S. from Y.S. The concern stemmed from one incident where Maria had informed Y.S., who was allowed only supervised visitation with N.S., about the location of an unsupervised visit with N.S. and the foster family. Further, DCFS insisted that N.S. had bonded with the foster family and appeared to be thriving in that environment.

During an evidentiary hearing on Maria's guardianship petition, the district court heard testimony from Maria; Kisha Earhart, the DCFS social worker in charge of supervising N.S.; and the foster mother. Maria testified that she had recently separated from her husband and had moved into a larger, four-bedroom home to accommodate the children. In addition, to support the children, Maria stated that she earned a regular wage as a kitchen worker and received Social Security benefits and food stamps from Medi-Cal each month for the children. Maria testified that her twenty-three-year-old daughter, the children's aunt, assisted her in watching the children while she was at work, often staying the night.

Earhart testified that she believed Maria would find it difficult to care for all six children. Earhart was also concerned that Maria would allow Y.S. unsupervised access to N.S. Earhart believed that Maria could not keep N.S. safe because she did not understand the extent of Y.S.'s drug addiction and criminal history. The foster mother testified that she and her husband are employed and have two natural children, one of whom still lives with them in their three-bedroom home.

At the conclusion of the hearing, the district court commended Maria for her efforts to keep the family together. However, it concluded that giving Maria the responsibility of another child was too much. Although Maria was successfully caring for N.S.'s five siblings, the court expressed concern that Maria lacked the time, emotional support, and financial resources to care for N.S. Further, the district court found that Y.S.'s drug problems and possible interaction with N.S. would make Maria's guardianship problematic. The district court noted that it was bothered by DCFS's decision to place N.S. in a foster home immediately, to the exclusion of the grandmother and the family. The court recognized that while there is a preference to place a child with his or her family, it was in N.S.'s best interest to stay with the foster parents because N.S. had already lived with them for a period of eight months. The district court noted that ''to disrupt that would be unfair to the child.'' Taking this factor into account, along with the foster parents' commitment, the district court concluded that there were adequate grounds for overcoming the familial preference. Consequently, the district court denied Maria's petition for guardianship. Maria immediately appealed the guardianship decision.

DCFS subsequently filed a permanency and placement review report in the district court, outlining its attempts to reunite Y.S. and N.S. However, Y.S. had not complied with her case plan and refused to submit to drug testing during the course of the review. DCFS concluded that reunification was not in the child's best interest, and thus, DCFS filed a petition to terminate Y.S.'s parental rights.[1]

Before the district court determined whether to grant the petition to terminate Y.S.'s parental rights, Maria petitioned the court, in the same underlying abuse and neglect proceedings, for visitation with N.S. On the same day that the district court held an evidentiary hearing to determine Maria's visitation rights, it entered an order terminating Y.S.'s parental rights with respect to N.S.

During the visitation hearing, Maria testified that she would be able to provide N.S. with all basic necessities, such as a home, food, clothing, and medical assistance, during any visitation periods. Maria also stated that she had never been arrested or convicted of a crime and that she attended church. N.S.'s foster parents opposed Maria's petition for visitation. The foster mother testified that she had concerns about allowing Maria visitation with N.S. because Maria had been dishonest in the past and had once informed Y.S. of the time and place that a visit with N.S. was to take place. Both Maria and the foster mother testified that their relationship had deteriorated after Maria filed the petition for guardianship. Maria's visits with N.S. continued throughout the duration of the case but became sporadic.

In its written order denying Maria's visitation petition, the district court found that Maria had a great deal of love and affection for N.S. The district court also observed that because the child was less than two years old and Maria's visits had become infrequent, any issue regarding emotional attachment between Maria and the child were not too problematic. But the court noted that ''granting visitation for babies over the objection of adoptive parents is more problematic.''

The district court further noted the foster mother's concern that ''while the grandmother feels very strongly about the grandmother's family, she feels less commitment to the prospective adoptive family.'' The district court noted the desire of the foster parents to adopt and raise N.S. without attachment to the natural family and their concern that the grandmother would allow Y.S. contact with N.S. The district court denied Maria's petition for visitation. Maria filed another appeal, contesting the denial of her visitation petition. After issuing an order stating that this court

---

[1]Y.S.'s parental rights with respect to her five other children have not been terminated, and she is allowed visitation with them at Maria's house.

lacked jurisdiction over the appeals, we directed Maria to file these consolidated original petitions for writs of mandamus.

## DISCUSSION

The decision to entertain a petition for a writ of mandamus lies within the discretion of this court.[2] A writ of mandamus is available to compel the performance of an act that the law requires, or to control an arbitrary or capricious exercise of discretion.[3] A writ of mandamus is an extraordinary remedy that will not issue if the petitioner has a plain, speedy, and adequate remedy in the ordinary course of law.[4] In the present matter, Maria does not have an adequate remedy at law because she cannot appeal from the order denying her guardianship petition[5] or from the order denying her visitation with her granddaughter as it arises in a juvenile proceeding.[6] Because her petition raises important issues regarding child custody, this court's intervention by way of extraordinary writ is warranted. Further, we conclude that clarification of Nevada's abuse and neglect statute, as it pertains to the familial preference for placement, and strong public policy warrant this court's intervention by way of extraordinary relief.

*A grandparent is a person with a special interest entitled to involvement in and notification of any plan for placement of the child*

In order to resolve the issues presented in these consolidated original petitions, we must carefully consider the provisions of Nevada's abuse and neglect statute, NRS Chapter 432B. In particular, we examine the method used by the district court to make an initial placement and custody determination with respect to a child in the state's protective custody.

Under NRS 432B.455(1), once the district court determines that a child must be kept in protective custody or must be placed in temporary or permanent custody, it may "conduct a hearing to identify the person most qualified and suitable to take custody of the child in consideration of the needs of the child for temporary or permanent placement." NRS 432B.457(1) provides that if a per-

---

[2]*State v. Dist. Ct. (Jackson)*, 121 Nev. 413, 416, 116 P.3d 834, 836 (2005).

[3]*See* NRS 34.160; *Dist. Ct. (Jackson)*, 121 Nev. at 415, 116 P.3d at 836.

[4]NRS 34.170.

[5]*See Taylor Constr. Co. v. Hilton Hotels*, 100 Nev. 207, 678 P.2d 1152 (1984) (recognizing that this court has jurisdiction to consider an appeal only when the appeal is authorized by statute or court rule); NRS 159.325 (authorizing appeals to supreme court from various guardianship proceedings).

[6]NRAP 3A(b)(2).

son has a special interest in the child's placement, the district court shall

> (a) Except for good cause, ensure that the person is involved in and notified of any plan for the temporary or permanent placement of the child and is allowed to offer recommendations regarding the plan; and
>
> (b) Allow the person to testify at any hearing held pursuant to this chapter to determine any temporary or permanent placement of the child.

Under NRS 432B.457(2)(a)(1), a parent or other relative of the child is a person who "has a special interest in a child."

Here, the district court sought to place N.S. pursuant to NRS 432B.550, which lists guidelines for placement under NRS 432B.455. NRS 432B.550(1) provides that the district court may, after receiving and reviewing the child welfare services report required under NRS 432B.540, place a child in the temporary or permanent custody of a relative or other suitable person or in the custody of a public agency or institution authorized to care for children. Further, at the time of Maria's petition, NRS 432B.550(5) provided, in part:

> In determining the placement of a child pursuant to this section, if the child is not permitted to remain in the custody of his parents or guardian, *preference must be given* to placing the child:
>
> (a) With any person related within the third degree of consanguinity to the child who is suitable and able to provide proper care and guidance for the child, regardless of whether the relative resides within this State.
>
> (b) If practicable, together with his siblings.[7]

(Emphasis added.) Because Maria was related to N.S. under 432B.550(5)(a), she was a person with "a special interest in the child" under 432B.457(1), entitled to offer recommendations, and to be involved in and notified of any plan for the temporary or permanent placement of the child.

Maria challenges the district court's order denying her petition for guardianship, arguing that the court failed to observe the applicable family preference established by NRS 432B.550(5). Because the district court granted initial custody of N.S. to DCFS based on a caseworker's impressions that Maria was overwhelmed with the responsibility of taking care of her five grandchildren, without

---

[7]The Legislature amended NRS 432B.550 in 2005 to create a presumption, rather than just a preference, that it is in a child's best interest to be placed together with his or her siblings. *See* NRS 432B.550(5)(a).

hearing Maria's views and recommendations on the placement plan under NRS 432B.457(1)(a), including her ability to take care of another child, we agree.

Here, the district court placed N.S. with DCFS pursuant to the recommendations of the CPS caseworker who had met with Maria. DCFS, in turn, placed N.S. with a foster family, which began N.S.'s bonding process with the foster family to the exclusion of Maria and the child's siblings. This decision put in motion a chain of events that effectively resulted in a permanent placement of N.S.

We note that although the best interest of the child standard guides the district court at all times, here the analysis " 'does not turn on whether the foster home is a "better" home, or the foster parents are "better" parents than the alternative home or family setting.' "[8] The district court's inquiry should instead focus on whether the " 'proposed placement plan satisfies the legislative goals and objectives of the [statute] by providing a stable, safe and healthy environment for the child considering *all* of the circumstances surrounding the placement.' "[9] As noted by the California Court of Appeal, an "underlying purpose of the relative placement preference is to facilitate reunification . . . . A relative, who presumably has a broader interest in family unity, is more likely than a stranger to be supportive of the parent-child relationship and less likely to develop a conflicting emotional bond with the child."[10] Further, the Supreme Court of Wyoming, in interpreting a federal statute conditioning financial assistance on a state's adoption of a familial preference, reasoned that such a "requirement helps avoid the situation where a child becomes overly attached to a foster family which is not biologically related to him."[11] The Minnesota Supreme Court has, in turn, concluded that "a party seeking avoidance of the statutory order of preference [has] the obligation to make an affirmative showing that the first preferred placement would be detrimental to the child."[12]

---

[8]*Youth and Family Services v. M.F.*, 815 A.2d 1029, 1038 (N.J. Super. Ct. App. Div. 2003) (quoting *State in Interest of L.L.*, 625 A.2d 559, 564 (N.J. Super. Ct. App. Div. 1993)).

[9]*Id.*

[10]*Cesar V. v. Superior Court*, 111 Cal. Rptr. 2d 243, 249-50 (Ct. App. 2001).

[11]*See In re Adoption of CF*, 120 P.3d 992, 1002 (Wyo. 2005) (interpreting 42 U.S.C. § 671(a)(19), which "provides that . . . the State shall consider giving preference to an adult relative over a non-related caregiver when determining a placement for a child, provided that the relative caregiver meets all relevant State child protection standards").

[12]*See Matter of Welfare of M.M.*, 452 N.W.2d 236, 239 (Minn. 1990) (construing detrimental to mean "either a demonstrated actual injurious impact

Maria was eligible for preferential consideration for placement under NRS 432B.550(5). The familial preference assures an interested relative that a district court will consider his or her request for placement before a stranger's request.[13] The district court's responsibility in this situation, after considering the suitability of Maria's home and N.S.'s best interest, was to determine whether placement with Maria was appropriate. However, the district court failed to give Maria the benefit of the familial preference for placement because the district court agreed with the CPS report, and granted custody to DCFS, without hearing Maria's views or recommendations on the placement plan. Maria, in turn, was forced to file a separate guardianship petition for the court's consideration. Under the circumstances of this case, the district court's decision to deny Maria's guardianship petition effected a permanent placement of N.S. with the foster family.

At this point in the proceedings, DCFS was still making efforts to reunify N.S. with Y.S. Therefore, although it was unlikely that Y.S. would comply with her case plan and become fit to resume custody of her child, the district court could not yet make any permanent placement decisions with respect to N.S. The district court reasoned that by granting Maria's petition, it would terminate its and DCFS's ability to monitor N.S.'s progress. But instead of dismissing the guardianship petition without prejudice, and thereby maintaining the temporary nature of the proceedings, the district court considered Maria's guardianship petition and applied factors relating to permanent placement of the child. Maria, already at a disadvantage compared to the foster family, faced the difficult task of proving that it would be in N.S.'s best interest to be removed from foster care and placed with her and the child's siblings.[14] Had the district court initially placed N.S. with Maria, it could have reassessed the temporary placement after several months to determine Maria's ability to care for all six of her grandchildren. The district court never gave Maria the opportunity to show her capability to keep her family together. Because the district court failed to ensure that Maria was involved in and notified of the plan for N.S.'s placement, she was not given the benefit of the familial preference, as established by NRS 432B.550(5). Therefore, we grant the mandamus petition in Docket No. 43919.

---

of the relationship on the physical or emotional well-being of the child or a showing to a reasonable degree of certainty that the facts and circumstances of the proposed placement pose the substantial likelihood that actual harm will occur'').

[13]See Alicia B. v. Superior Court, 11 Cal. Rptr. 3d 1, 5 (Ct. App. 2004).

[14]The district court noted: ''We have found a home. By all admissions, a good home for the child. They're doing very well for the child. They plan on adopting the child. They have made the commitment. . . . The child has been there now for a period of seven, eight months. Things aren't equal anymore.''

*The foster parent's testimony was improperly determinative of the district court's decision to deny Maria's petition for visitation*

NRS Chapter 125C, Nevada's custody and visitation statute, establishes procedures for granting noncustodial parents and other relatives visitation with children. If the district court terminates a natural parent's parental rights and places the child in the custody of a public agency, the district court may grant the grandparents of the child "a reasonable right to visit the child during his minority if a petition therefor is filed with the court before the date on which the parental rights are relinquished or terminated."[15] Under NRS 125C.050(7), the district court "must find, by a preponderance of the evidence, that the visits would be in the best interests of the child in light of the considerations set forth in [NRS 125C.050(6)(a)-(i)]."[16] Maria contends that the district court erred when it denied her petition for visitation after considering the foster parents' desires regarding visitation. Although the district court may hear testimony from a foster parent to determine a child's best

---

[15]NRS 125C.050(7).

[16]NRS 125C.050(6)(a)-(i) provides:

In determining whether the party seeking visitation has rebutted the presumption established in subsection 4, the court shall consider:

(a) The love, affection and other emotional ties existing between the party seeking visitation and the child.

(b) The capacity and disposition of the party seeking visitation to:

(1) Give the child love, affection and guidance and serve as a role model to the child;

(2) Cooperate in providing the child with food, clothing and other material needs during visitation; and

(3) Cooperate in providing the child with health care or alternative care recognized and permitted under the laws of this State in lieu of health care.

(c) The prior relationship between the child and the party seeking visitation, including, without limitation, whether the child resided with the party seeking visitation and whether the child was included in holidays and family gatherings with the party seeking visitation.

(d) The moral fitness of the party seeking visitation.

(e) The mental and physical health of the party seeking visitation.

(f) The reasonable preference of the child, if the child has a preference, and if the child is determined to be of sufficient maturity to express a preference.

(g) The willingness and ability of the party seeking visitation to facilitate and encourage a close and continuing relationship between the child and the parent or parents of the child as well as with other relatives of the child.

(h) The medical and other needs of the child related to health as affected by the visitation.

(i) The support provided by the party seeking visitation, including, without limitation, whether the party has contributed to the financial support of the child.

interest, we conclude that in this case, the district court gave undue weight to the foster parents' desires to raise N.S. without attachment to her natural family.

Here, Maria properly petitioned the district court for visitation with N.S., under NRS 125C.050(7), before the district court terminated Y.S.'s parental rights. Maria argues that the district court erred when it considered the foster parents' opposition to her petition as part of its analysis because, under NRS 125C.050(7), the district court may not consider NRS 125C.050(6)(j), relating to "the need for granting a right to visitation . . . against the wishes of a parent of the child." We agree that NRS 125C.050(7) excludes paragraph (j) from the analysis because the section relates to the wishes of the natural parents regarding visitation, which are no longer a relevant consideration after the district court terminates parental rights. In contrast, we conclude that the district court may still consider a foster parent's testimony as one of the factors relating to the child's best interest. However, in this case, the foster mother's testimony was improperly determinative of the decision to deny Maria's visitation petition.

We conclude that the district court erred in determining that N.S.'s best interest would be served by giving the foster parents and the child "an opportunity to become a true family without the interference of the natural family," despite also finding that Maria satisfied other factors such as moral fitness and ability to meet N.S.'s needs during any visitation periods. The United States Supreme Court, in *Smith v. Organization of Foster Families*, recognized that a foster child may develop a meaningful bond with his or her foster parents, especially "where a child has been placed in foster care as an infant, has never known his natural parents, and has remained continuously for several years in the care of the same foster parents."[17] But the *Smith* Court also noted that "whatever emotional ties may develop between foster parent and foster child have their origins in an arrangement in which the State has been a partner from the outset."[18] A foster parent's rights regarding his or her foster child must be distinguished from those of a natural or adoptive parent. At the time of the hearing, the foster parents, although considering adopting N.S., were still just her foster parents.

We do not question the fact that N.S. has bonded with her foster parents with whom she has lived continuously since her birth. Rather, our concern lies in the fact that the foster family was given the opportunity to bond with N.S. to the exclusion of her natural family. Maria did not have an equal opportunity to bond with her grandchild because DCFS placed N.S. with a foster fam-

---

[17]431 U.S. 816, 844 (1977).

[18]*Id.* at 845.

ily as soon as was practicable. Thus, ever since N.S.'s birth, the foster family has had the advantage of building a bond with N.S. to Maria's detriment. As a result, although the district court found that Maria satisfied the remaining factors under NRS 125C.050, the district court gave the foster parents' wishes undue weight in denying Maria's visitation petition. Therefore, we grant the mandamus petition in Docket No. 45415.

## CONCLUSION

The district court erred in denying Maria's guardianship petition because the district court failed to ensure that Maria was involved in and notified of any plan for N.S.'s temporary or permanent placement before the petition was filed and thereafter failed to give Maria the benefit of the familial preference for placement. Further, in denying Maria's visitation petition, the district court gave improper weight to the foster parents' wishes when determining N.S.'s best interest. Accordingly, we conclude that writ relief is warranted. We grant Maria's consolidated petitions and direct the clerk of this court to issue a writ of mandamus that directs the district court to vacate its order denying Maria's guardianship petition and to reconsider the petition after examining the familial preference for initial placement. The writ shall also direct the district court to vacate its order denying Maria's visitation petition and to reconsider the petition if it determines that Maria's guardianship petition should be denied.[19]

MAUPIN and HARDESTY, JJ., concur.

---

[19]We vacate the December 19, 2005, order granting a temporary stay of the adoption proceedings.