# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1742-18T2

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

A.H.,

      Defendant-Appellant,

and

V.J.,

      Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF K.V.J.,

      a Minor.

_____

Submitted October 10, 2019 – Decided November 8, 2019

Before Judges Nugent and DeAlmeida.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FG-07-0068-18.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender, of counsel; Sigrid Sletteland Franzblau, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jane C. Schuster, Assistant Attorney General, of counsel; Amy L. Bernstein, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Todd S. Wilson, Designated Counsel, on the brief).

PER CURIAM

Defendant A.H. appeals from the December 3, 2018 order of the Chancery Division terminating her parental rights to her daughter K.V.J.[1]  We affirm.

I.

A.H. gave birth to K.V.J. in 2016.  Defendant V.J. is the child's father.  He surrendered his parental rights and has not participated in this appeal.

A little more than four months after K.V.J.'s birth, the Division of Child Protection and Permanency (DCPP or Division) received a referral A.H. had dropped the child off at her cousin's house a month earlier.  The cousin reported

---

[1]  We use initials to protect the anonymity of the child.  R. 1:38-3(d).

she had no contact information for A.H., apart from her Facebook page, and did not know where she was. A.H. had not left proof of the child's medical insurance or written authorization to make medical decisions for the child. In addition, apart from twenty-four dollars A.H. left on a windowsill, the cousin received no financial support from A.H. to care for the child. The cousin reported A.H. had been using drugs, was hearing voices, and told her she did not want K.V.J.

A few days later, Division representatives found A.H. waiting on the porch of her cousin's home. A.H. was intent on taking K.V.J. to Pennsylvania. The cousin had called police and refused to permit A.H. into her home because of her history of violent behavior. A.H. was uncooperative but admitted she left K.V.J. with her cousin with no provisions for her care. A.H. acknowledged she was unstable, had been "running the streets," and was not taking medication prescribed for her psychiatric illnesses. A.H. appeared to be under the influence of controlled substances, as she nodded off several times while speaking with the DCPP staff members. By the time police arrived, A.H. was unresponsive. DCPP effectuated a "Dodd removal" of K.V.J.[2] The notice of removal was left on A.H.'s lap because she was not conscious.

---

[2] A "Dodd removal" refers to the emergency removal of a child from the home without a court order pursuant to N.J.S.A. 9:6-8.21 to -8.82, known as the Dodd Act. N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 26 n.11 (2011).

DCPP filed a complaint in the Chancery Division seeking custody, care, and control of K.V.J. The court granted temporary custody to DCPP. The Division's plan was to provide services to A.H. to facilitate reunification.

DCPP placed K.V.J. with A.H.'s cousin and offered A.H. supervised visitation at DCPP's office. The Division also scheduled A.H. for services, which she did not attend. She yelled profanities at a DCPP caseworker who attempted to reschedule the services.

A.H. did not visit K.V.J. for almost a month after the child's removal from her custody. During part of that time, A.H. was hospitalized after being found wandering the streets in a state of paranoia. Shortly after her first visit with K.V.J., A.H. was arrested on three outstanding warrants. While in jail, A.H. admitted to hearing voices. DCPP arranged for A.H. to attend an intensive outpatient drug treatment program and anger management classes. A.H. failed to participate in those services.

During the following months, A.H. was hospitalized several times for psychiatric issues. During one hospitalization, A.H. was placed in restraints due to her aggressive behavior. She admitted to having taken herself off medications prescribed for bipolar disorder and schizophrenia. She was arrested and convicted of assaulting a police officer, involuntarily committed several times,

admitted to hearing the voices of God and her children calling out to her, and reported having visions of her children when they were not with her.

After being found wandering outside a police station, A.H. admitted being depressed and suicidal. She acknowledged using "molly," the commonly used name for MDMA, a synthetic drug that alters mood and perception, and Xanax, a drug used to treat anxiety and panic disorders. She said "molly" gave her special powers to read people's minds and made her feel closer to God. At a court hearing A.H. tested positive for amphetamines, methamphetamines, benzodiazepines, and antidepressants. Although claiming some of these drugs had been prescribed for her, A.H. did not produce proof of any prescriptions, despite court orders to do so. DCPP referred A.H. for several psychological evaluations. She did not attend any of her scheduled appointments.

Although A.H. claimed to have been receiving services in Pennsylvania, where she then lived, she did not produce evidence of her claim. DCPP's attempts to get records of A.H.'s treatment in Pennsylvania were not successful.

DCPP referred A.H. to a certified drug and alcohol counselor on several occasions. She repeatedly failed to appear. When she did attend an evaluation, she was "very hostile and very aggressive" and refused to give a urine sample.

A.H.'s visits with K.V.J. were sporadic. DCPP was unable to contact A.H. for long periods of time. On occasion, months would pass between visits. When the child was fifteen-months old, A.H. visited after a five-month absence. K.V.J. was visibly upset during the visit and cried when A.H. would reach for her. A month later, A.H. visited K.V.J. She had to resort to candy to tempt the child to come to her because K.V.J. was unfamiliar with her mother. A.H. did not visit the child again until three months later. During that visit, K.V.J. was again unfamiliar with A.H. During her final visit, A.H. told K.V.J. that she had to come home with her to stop A.H. from "going crazy." A.H. admitted that she was triggered by the visit and felt a "psychiatric episode" coming on.

In December 2017, K.V.J. was moved from the cousin's house and placed in a DCPP-approved resource home. The change in physical custody was brought about by the cousin's inability or refusal to provide required medical and personal records to DCPP and to make repairs to the cousin's home deemed necessary for the child's safety.

DCPP contacted and assessed several maternal and paternal relatives as possible placements for K.V.J. The evaluation of the father's adult daughter was unsuccessful because she and her roommate refused to be fingerprinted. A.H.'s mother, who had custody of some of A.H.'s other children, was evaluated by

6

DCPP. She informed the agency she did not want to care for any additional children. DCPP ruled out A.H.'s grandmother because she was living in senior housing, which precluded placement of the child. The father's sister refused to participate in the DCPP evaluation process. Two additional out-of-state placements, including A.H.'s aunt, were considered.

The father recommended C.S., a family friend in Georgia he considered to be his stepsister. C.S. was a licensed foster parent with a history of providing foster care in New Jersey and Georgia. The child was placed with C.S. after she was approved as a resource parent. C.S. expressed her desire to adopt K.V.J. A DCPP evaluation determined K.V.J. was receiving excellent care and support from C.S. The court subsequently held a permanency hearing and approved DCPP's plan for termination of A.H.'s parental rights.

A trial was held in November 2018. A.H. did not attend the trial and her attorney reported that she did not wish to appear by telephone. DCPP did not offer an expert witness to opine on the bond between A.H. and the child because A.H. refused to submit to a bonding evaluation. A.H. did not call any witnesses. The law guardian representing K.V.J.'s interests supported DCPP's application.

The trial court issued an oral opinion concluding DCPP satisfied the four-prong statutory criteria for termination of A.H.'s parental rights. The court

A-1742-18T2

found A.H.'s failure to provide for the care of K.V.J., her effective abandonment of the child, history of incarceration, drug abuse, hospitalizations, and refusal to take psychiatric medications harmed and endangered K.V.J. In addition, the court found A.H. unable or unwilling to address the causes of the harms.

The court found "[t]here's absolutely no question" DCPP made reasonable efforts to reunify A.H. and K.V.J. by offering A.H. numerous services, but A.H. refused to participate in those services. Finally, the court found termination of A.H.'s parental rights would not do more harm than good to K.V.J. The court concluded A.H. had, in effect, already terminated her relationship with the child and K.V.J. would not be harmed by separation from A.H. Based on these findings, the court entered a December 3, 2018 order terminating A.H.'s parental rights to K.V.J.

This appeal followed. A.H. raises the following arguments for our consideration:

> THE TRIAL COURT ERRED IN FINDING THAT THE DIVISION CARRIED ITS CLEAR AND CONVINCING BURDEN OF PROOF UNDER N.J.S.A. 30:4C-15.1(a).
>
> A. THE TRIAL COURT ERRED IN FINDING PRONG THREE WAS SATISFIED BECAUSE DCPP DID NOT MAKE ANY MEANINGFUL EFFORT TO PROVIDE SERVICES TO A.H.

B. THE TRIAL COURT ERRED IN FINDING PRONG THREE WAS SATISFIED BECAUSE THE DIVISION DID NOT INVESTIGATE OR ASSESS THE RELATIVES OF A.H. AS POTENTIAL PLACEMENTS FOR K.V.J.

II.

Our scope of review on appeal from an order terminating parental rights is limited. N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007). We will uphold a trial judge's factfindings if they are "supported by adequate, substantial, and credible evidence." N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 552 (2014). "We accord deference to factfindings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012); see Cesare v. Cesare, 154 N.J. 394, 413 (1998). "Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a denial of justice." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting G.L., 191 N.J. at 605). We also accord deference to the judge's credibility determinations "based upon his or her opportunity to see and hear the witnesses." N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 88

(App. Div. 2006). No deference is given to the court's "interpretation of the law" which is reviewed de novo. D.W. v. R.W., 212 N.J. 232, 245-46 (2012).

When terminating parental rights, the court focuses on the "best interests of the child standard" and may grant a petition when the four prongs set forth in N.J.S.A. 30:4C-15.1(a) are established by clear and convincing evidence. In re Guardianship of K.H.O., 161 N.J. 337, 347-48 (1999). "The four criteria enumerated in the best interests standard are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." Id. at 348.

N.J.S.A. 30:4C-15.1(a) requires the Division to prove:

(1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

> (4)    Termination of parental rights will not do more
>         harm than good.

A.H. challenges only the court's determination DCPP satisfied the third prong of the statutory test. Specifically, she argues the Division did not make reasonable efforts to provide appropriate services to assist her in achieving the stability necessary to care for K.V.J. In addition, A.H. argues DCPP did not satisfy its obligation to assess placement of the child with a relative before placing her with a non-related family friend.

Under prong three, DCPP's efforts must be analyzed "with reference to the circumstances of the individual case[,]" including the parent's degree of participation. In re Guardianship of DMH, 161 N.J. 365, 390 (1999). N.J.S.A. 30:4C-15.1(c) defines reasonable efforts as those reasonable "attempts by an agency authorized by [DCPP] to assist the parents in remedying the circumstances and conditions that led to the placement of the child and in reinforcing the family structure . . . ." The statute sets forth examples of "reasonable efforts," including but not limited to:

> (1)    consultation and cooperation with the parent in
>        developing a plan for appropriate services;
>
> (2)    providing services that have been agreed upon, to
>        the family, in order to further the goal of family
>        reunification;

(3)  informing the parent at appropriate intervals of the child's progress, development, and health; and

(4)  facilitating appropriate visitation.

[Ibid.]

After carefully reviewing A.H.'s arguments in light of the record and applicable legal principles, we are convinced there is adequate, substantial, and credible evidence supporting the trial judge's findings of fact and agree with its legal conclusion DCPP satisfied all of the statutory requirements for termination of A.H.'s parental rights to K.V.J.

The record demonstrates DCPP offered A.H. numerous opportunities to address her mental health and substance abuse issues and her apparent inability to provide a safe and secure existence for K.V.J. The Division offered A.H. counseling, psychological and psychiatric evaluations, parenting skills classes, anger management classes, substance abuse evaluations, supervised visitation, and family team meetings. She failed to take advantage of those opportunities.

It is apparent that A.H. suffers from serious mental health and substance abuse issues that likely explain her unwillingness or inability to participate in the services needed to become a reliable parent to K.V.J. Her failure to

participate in services, even if arising from her illnesses, does not negate the reasonable efforts the Division made to reunify A.H. with her daughter.

We see no merit in A.H.'s argument DCPP should have done more to confirm the services A.H. claimed to have been receiving in Pennsylvania or yielded to that State's supervision of the relationship between A.H. and K.V.J. A.H. did not produce evidence of successful treatment in Pennsylvania of her substance abuse issues or compliance with her psychiatric medication regimen. DCPP cannot be faulted for continuing its efforts to provide services to A.H. in New Jersey and pursuing a permanency plan for K.V.J., who was in this State.

Nor are we convinced DCPP failed to consider A.H.'s family members as placements for K.V.J. before placing her with C.S. It is "well established that it is the Division's policy to place children with relatives whenever possible." N.J. Div. of Youth & Family Servs. v. M.F., 357 N.J. Super. 515, 527 (App. Div. 2003). There is, however, no presumption in favor of placement with a relative over a suitable third party. Id. at 528-29. There is adequate, substantial, and credible evidence supporting the trial court's conclusion DCPP actively pursued relatives of A.H. for placement of K.V.J. The cousin at whose home A.H. initially left K.V.J. failed to complete the process necessary for DCPP approval. A.H.'s mother informed the agency she did not want to care for any additional

children. A.H.'s grandmother lived in senior housing, where placement of an infant is not permitted. When the Division placed K.V.J. with C.S., review of A.H.'s aunt in Pennsylvania was still pending. The outcome of that review was uncertain. The record supports the trial court's finding there was no reason to delay K.V.J.'s placement in a home where she had a likelihood of permanency to await the outcome of the review of A.H.'s aunt. A.H. had failed to provide a stable and secure home for her daughter, who had been in foster care for nearly two years at the time of her placement with C.S. See N.J. Div. of Youth & Family Servs. v. J.S., 433 N.J. Super. 69, 87 (App. Div. 2013) ("The Division must perform a reasonable investigation of such relatives that is fair, but also sensitive to the passage of time and the child's critical need for finality and permanency.").

 Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION