18 A.3d 193 (2011)
419 N.J. Super. 568
NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, Plaintiff-Respondent,
v.
K.L.W. and P.L.J., Defendants-Appellants.
In the Matter of the Guardianship of K.K.W., Minor.
A-5178-09T3, A-5234-09T3.
Superior Court of New Jersey, Appellate Division.
Argued March 28, 2011.
Decided May 3, 2011.
*194 Angelo G. Garubo, Designated Counsel, argued the cause for appellant K.L.W. (Yvonne Smith Segars, Public Defender, attorney; Mr. Garubo, on the brief).
Mark E. Kleiman, Designated Counsel, argued the cause for appellant P.L.J. (Yvonne Smith Segars, Public Defender, attorney; Mr. Kleiman, on the brief).
Ella Skora, Deputy Attorney General, argued the cause for respondent (Paula T. Dow, Attorney General, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Ms. Skora, on the brief).
Damen J. Thiel, Designated Counsel, argued the cause for minor (Yvonne Smith Segars, Public Defender, Law Guardian, attorney; Mr. Thiel, on the brief).
Before Judges A.A. RODRÍGUEZ, GRALL and C.L. MINIMAN.
The opinion of the court was delivered by
GRALL, J.A.D.
P.L.J. and K.L.W., the mother and father of K.K.W., appeal separately from a judgment terminating their respective parental rights. They primarily argue that reversal is required because the Division of Youth and Family Services (Division) failed to meet its obligation to "initiate a search for relatives who may be willing and able to provide the care and support required by the child." N.J.S.A. 30:4C-12.1(a). The Division and the child's Law Guardian urge us to affirm. We have consolidated the appeals and hold that the Division lost sight of its duty to proceed in K.K.W.'s best interests by not carrying out its obligation under N.J.S.A. 30:4C-12.1(a). Because the Division's noncompliance affected the trial judge's analysis of K.K.W.'s best interests under *195 N.J.S.A. 30:4C-15.1(a)(1)-(4), we reverse and remand.
K.K.W. was born in late March 2008. At the time of her premature birth, K.K.W. and her mother tested positive for cocaine and K.K.W. required intensive care. P.L.J. had not had prenatal care, and she told hospital staff about her history of drug abuse and depression. She admitted to having no place to live with the baby and none of the furnishings and supplies K.K.W. would need. Subsequently, P.L.J. stipulated that her conduct amounted to neglect of K.K.W.
P.L.J. was about thirty-five years old when K.K.W. was born. K.K.W. is not P.L.J.'s first child, and this is not P.L.J.'s first encounter with the Division. Prior allegations of P.L.J.'s abuse and neglect were not substantiated, but she voluntarily transferred custody of her first four children to their maternal grandparents.[1] When K.K.W. was born, P.L.J.'s other childrena son who was eighteen and three younger daughtershad been in their grandparents' care for about three years. According to P.L.J., she had not been able to get back "on her feet."
P.L.J. told K.K.W.'s caseworker that her older children were with her parents, who had tried to see K.K.W. in the hospital but could not because of rules for visitation in the intensive care unit.[2] Nonetheless, P.L.J. asked the caseworker not to contact her parents because they did not know about her drug use. According to one caseworker, the Division did not contact the maternal grandparents out of concern for P.L.J.'s privacy, and according to another, because they had no way to contact them.
P.L.J. asked the Division to place K.K.W. with the baby's father, K.L.W. He was about forty years old when the child was born and was not living with P.L.J. The caseworker spoke to K.L.W., but he said he worked as a long-distance truck driver and could not take the baby at that time. K.L.W. told the caseworker that he would ask relatives with whom he lived to assist him and agreed to meet with a caseworker so that his home could be assessed.
K.K.W. has never been in the custody of a parent or relative. On April 3, 2008, the Division filed an order to show cause and a complaint alleging abuse and neglect and obtained custody of K.K.W. At that time, K.K.W. had not yet been discharged from the hospital. Although K.K.W. did not go through withdrawal, she had feeding problems and other medical issues. Because of her fragile condition, K.K.W. was kept in the hospital until May 2008. Upon discharge, K.K.W. was placed with St. Clare's Home for Children, an agency that addresses the needs of medically fragile children, where she remained until September 2008.
Although an April 25, 2008 summary of this case prepared and approved by the Division includes the names and the address of K.K.W.'s maternal grandparents and her sisters in their custody, when K.K.W. was released from St. Clare's in September 2008, she was placed with Mrs. T. Mrs. T. was a single resource mother who had two children she previously adopted living with her, and she took in another child after K.K.W. was placed in her home. K.K.W. was about five and one-half months when she went to live with Mrs. T.
*196 The Division received additional information about relatives in April 2008. K.L.W. provided the names and phone numbers of relatives in New Jersey who might be willing to care for the child.[3] But for reasons not reflected in the record, the Division was unable to connect with those relatives.
After K.K.W. was placed with Mrs. T., the parents identified additional relatives. In October 2008, P.L.J. asked the Division to consider a cousin who was caring for a fifteen-year-old child under the Kinship Legal Guardianship Act, N.J.S.A. 3B:12A-1 to -7. According to the caseworker, that cousin told her he and his wife were not in a position to care for a medically fragile child with a condition that involved drugs.[4]
By December 2008, Mrs. T. expressed interest in adopting the baby. Although the Division still planned to reunify K.K.W. and her parents, it made no effort, at least none discernible on this record, to place K.K.W. with a relative. On February 27, 2009, the Division planned to seek termination of parental rights and have K.K.W. adopted. The caseworker and supervisor who prepared and approved that plan mistakenly reported that the eleven-month-old K.K.W. had been in the care and custody of the Division for twelve months. Actually, K.K.W. had been in the Division's care for less than eleven months.
Eight months after K.K.W. was placed with Mrs. T., in May 2009, the Division filed a guardianship complaint and proposed adoption by Mrs. T. Thereafter, both parents identified additional relatives as potential caregivers. P.L.J. asked the Division to consider her sisters. One sister was living in South Carolina. While it is not clear when P.L.J. named her sisters, orders and transcripts of case management conferences starting on June 18, 2009, indicate that the Division was directed to arrange for an assessment of the South Carolina sister's ability to care for K.K.W. Those records also reflect that the Division advised the judge that it had completed the paperwork as directed. Nevertheless, at trial a caseworker testified that P.L.J. never gave him the information he needed to contact either of P.L.J.'s sisters. Given the representations of prior caseworkers about initiating the assessment, we assume that the testimony was inaccurate with respect to the sister living in South Carolina. In any event, the record does not disclose the result, if any, of the investigation of P.L.J.'s sister in South Carolina.
Admittedly, P.L.J. played a role in K.K.W.'s initial and continued placement with Mrs. T. It was not until August 2009 that P.L.J. told her parents about K.K.W.'s status. Before that, she had led them to believe that the baby was with a relative of K.L.W. Once the maternal grandparents knew that K.K.W. was in foster care, the maternal grandmother and P.L.J. made arrangements for the maternal grandmother and K.K.W.'s sisters to *197 see K.K.W. during one of P.L.J.'s supervised visits.
By fortuity, that visit gave K.K.W.'s grandparents and her sisters an opportunity to see K.K.W. regularly on Sundays in church. One of K.K.W.'s sisters saw and recognized K.K.W. in church with Mrs. T. It turned out that Mrs. T. and K.K.W.'s grandparents and siblings regularly attended the same Sunday service. Thereafter, Mrs. T. allowed K.K.W.'s family to have contact with the baby at church.
Notwithstanding this contact between K.K.W. and her sisters, P.L.J. did not ask the Division to consider placing K.K.W. with her maternal grandparents until November 2009. Subsequently, a caseworker had a telephone conversation with the grandmother, but no one from the Division went to speak with the grandparents or inspect their home until April 2010. The caseworker left an application, but the maternal grandparents did not complete it because they expected the caseworker to call them with the results of the inspection. The only problem identified was the need for some type of screen or shutter for the areas in which K.K.W. would sleep. K.K.W.'s grandmother went to visitations scheduled for P.L.J. and K.K.W. about six times between August 2009 and the commencement of the guardianship trial in May 2010, and she participated in a mediation held prior to trial.
K.K.W.'s maternal grandfather pursued a different path after learning his granddaughter was in foster care. In August 2009, he told his niece, another of P.L.J.'s cousins, about K.K.W.'s birth and predicament. Because this cousin was in the process of obtaining approval to serve as a foster parent through Catholic Charities, she vowed to do what she could to have the child placed with her. Catholic Charities ultimately denied approval because the only person the cousin had to assist her was her then twenty-year-old daughter. Catholic Charities requires a foster parent to have an alternative caregiver that is at least twenty-one.
P.L.J.'s cousin did not call the Division until February or March 2010. At that time, the Division suggested that she continue to seek approval through Catholic Charities, but she persisted and also applied for approval through the Division. At the time of trial, the cousin's application was still pending and she had gone to visit K.K.W. twice, once during each of the two weeks preceding trial.
K.L.W. also named additional relatives after the guardianship complaint was filed. During a case management conference on November 19, 2009, K.L.W. gave the Division the name of an aunt living in Bayonne who worked at Bayonne High School and had been employed there since K.L.W. was in high school. At trial, the caseworker explained that he did not contact the aunt because K.L.W. had not provided any information other than her name.
K.L.W. also named a cousin in South Carolina. According to the caseworker, the Division contacted the South Carolina child protective agency and was told that the agency would not approve the cousin because he already had a license as a therapeutic foster parent. According to the caseworker, the cousin decided he did not want to file for a second approval because he was afraid that it would jeopardize the license he already had.
In March 2010, the Division arranged for Dr. Mark Singer, a psychologist, to assess the bond between K.K.W. and Mrs. T. He concluded that K.K.W. had come to view Mrs. T. as her psychological parent and that K.K.W. would suffer enduring harm if separated from her. He noted, however, that the harm could be mitigated if K.K.W. had other significant, consistent *198 and healthy parental figures in her life. He recommended that any such figures should participate in bonding evaluations because with an "appropriate parental attachment figure," the harm of separation from Mrs. T. could be mitigated.
Dr. Richard Klein conducted bonding evaluations for the defense in November 2009 and January 2010. He agreed with Dr. Singer that K.K.W. and Mrs. T. were bonded and that the child saw her as her "primary parent." The experts' opinions differed only on the long-term effects of separating a child of K.K.W.'s young age from his or her primary caretaker. Both psychologists noted a conflict in the relevant literature about the enduring impact of separation on a child of K.K.W.'s age, but both acknowledged that an appropriate caregiver could mitigate the harm.
Both Drs. Singer and Klein also evaluated the bond between K.K.W. and P.L.J. They agreed that K.K.W. was familiar with P.L.J. and that their interactions were positive and appropriate. In Dr. Singer's view, the child would not suffer enduring harm if her relationship with her mother were terminated. Dr. Klein offered no opinion on that point.
Reports on the parents' supervised visitations were generally positive. After the first months, P.L.J. attended with some consistency but K.L.W. did not. There is evidence that P.L.J. was quite attuned to the child's needs. During one supervised visit, P.L.J. pointed out problems indicating that K.K.W. was not receiving optimal care in Mrs. T.'s home, and the supervisor's report confirmed that K.K.W.'s "private areas were not cleaned properly" and there was a barrette in the child's shoe that had left an "imprint" on her foot. There is also no indication that either parent's interaction with K.K.W. was less than appropriate during any visit.
Despite the positive visits, at the time of trial, neither parent contended that K.K.W. could be returned to them at that time. Between the filing of the complaint and the entry of the judgment, the Division had provided visitation and arranged parenting classes, counseling and substance abuse treatment for both parents. Nonetheless, just prior to trial, both P.L.J. and K.L.W. tested positive for cocaine. At one point, P.L.J. was given the opportunity for treatment in a facility that would have allowed her and K.K.W. to live together, but P.L.J. did not take advantage of that program.
On the foregoing evidence, the trial judge decided that termination of parental rights was in the best interests of K.K.W. as defined in N.J.S.A. 30:4C-15.1(a)(1)-(4).
He found that K.K.W. was placed at risk of harm by her mother's neglect during pregnancy and was actually harmed by her parents' inability to care for and nurture her thereafter. N.J.S.A. 30:4C-15.1(a)(1)-(2). The judge was convinced that the Division made reasonable efforts to assist the parents in remedying the circumstances and conditions that led to K.K.W.'s placement. N.J.S.A. 30:4C-15.1(a)(3), (c). Relying on Dr. Singer's expert opinion, which the judge found more persuasive than Dr. Klein's because it was based on specified observations during the bonding evaluations as well as the literature, the judge concluded that K.K.W. would suffer "serious and enduring emotional or psychological harm" if separated from Mrs. T. N.J.S.A. 30:4C-15.1(a)(2). The judge also considered the harm of separation and the unlikelihood that the parents would be able to assume their responsibilities in the foreseeable future, and he concluded that termination of parental rights would "not do more harm than good" in light of K.K.W.'s need for permanency and stability. N.J.S.A. 30:4C-15.1(a)(4).
*199 Under our limited standard of review, we are obligated to accept factual findings that "are supported by `adequate, substantial and credible evidence' on the record" and based on the judge's assessment of credibility. N.J. Div. of Youth and Family Servs. v. M.M., 189 N.J. 261, 279, 914 A.2d 1265 (2007) (quoting In re Guardianship of J.T., 269 N.J.Super. 172, 188, 634 A.2d 1361 (App.Div.1993)). Moreover, we must accord deference to the "judge's evaluation of the underlying facts and the implications to be drawn therefrom" unless they are "so wide of the mark that a mistake must have been made." Ibid. In this case, our disagreement is with the judge's legal conclusion about the Division's obligation to search for relatives, in particular the Division's failure to contact the maternal grandparents who had custody of K.K.W.'s siblings. On that point, we owe no deference. Manalapan Realty, L.P. v. Manalapan Twp. Comm., 140 N.J. 366, 378, 658 A.2d 1230 (1995).
The Division's primary obligation upon removal of a child is to serve the best interests of the child. N.J.S.A. 30:4C-12 (standard for placing child in the custody and care of the Division); N.J.S.A. 30:4C-15 (standard for placements); N.J.S.A. 30:4C-15.1 (standard for termination). Parental rights are constitutionally protected, and the Division's right to intervene is based on "the State's parens patriae responsibility to protect the welfare of children." N.J. Div. of Youth and Family Servs. v. G.L., 191 N.J. 596, 605, 926 A.2d 320 (2007) (internal quotations omitted). True, the Division has an obligation to make "reasonable efforts" to help the parents correct conditions that led to the child's removal, but that obligation is consistent with its obligation to serve the best interests of the child. N.J.S.A. 30:4C-15(d); N.J.S.A. 30:4C-15.1(a)(3).
The Division has a statutory obligation to contact relatives of a child in its custody. N.J.S.A. 30:4C-12.1 provides:
a. In any case in which the Department of Children and Families accepts a child in its care or custody, including placement, the department shall initiate a search for relatives who may be willing and able to provide the care and support required by the child. The search shall be initiated within 30 days of the department's acceptance of the child in its care or custody. The search will be completed when all sources contacted have either responded to the inquiry or failed to respond within 45 days. The department shall complete an assessment of each interested relative's ability to provide the care and support, including placement, required by the child.
b. If the department determines that the relative is unwilling or unable to assume the care of the child, the department shall not be required to re-evaluate the relative. The department shall inform the relative in writing of:
(1) the reasons for the department's determination;
(2) the responsibility of the relative to inform the department if there is a change in the circumstances upon which the determination was made;
(3) the possibility that termination of parental rights may occur if the child remains in resource family care for more than six months; and
(4) the right to seek review by the department of such determination.
c. The department may decide to pursue the termination of parental rights if the department determines that termination of parental rights is in the child's best interests.
[(Emphasis added).]
*200 This obligation was codified in 1991 in connection with amendments intended to provide a reasonable time frame for completion of the termination process and delineate the circumstances in which termination may result. Assembly Judiciary Law & Public Safety Committee, Statement to S. 2580 (reprinted as note following N.J.S.A. 30:4C-12.1). Furthermore, this obligation is unambiguously placed on the Division.
In the trial court, the Division argued that its failure to contact K.K.W.'s maternal grandparents was justified and appropriate because it was obligated to respect P.L.J.'s privacy and honor her request to refrain from contacting her parents.[5] By placing the mother's wishes above the child's best interests, the Division lost sight of the serious responsibility it assumed when it acquired a court order placing K.K.W. in its custody and care. After all, the Division knew that K.K.W.'s siblings were living with and in the custody of their maternal grandparents and there is nothing in the record that suggests the Division had any reason to believe that K.K.W.'s best interests would not be well-served by placement with them. This court has previously acknowledged with approval "the Division's policy to place children with relatives whenever possible." N.J. Div. of Youth and Family Servs. v. M.F., 357 N.J.Super. 515, 527, 815 A.2d 1029 (App.Div.2003); N.J. Div. of Youth and Family Servs. v. K.F., 353 N.J.Super. 623, 636, 803 A.2d 721 (App.Div.2002); In re E.M.B., 348 N.J.Super. 31, 34, 791 A.2d 256 (App.Div.2002). In addition, the Supreme Court has observed that the "value of nurturing and sustaining sibling relationships" cannot be underestimated. N.J. Div. of Youth and Family Servs. v. S.S., 187 N.J. 556, 559, 902 A.2d 215 (2006) (also discussing the Division's policy and statutes recognizing sibling relationships).
The Legislature also has recognized the importance of family placements in termination proceedings. The Division need not file a petition to terminate parental rights if a "child is being cared for by a relative and a permanent plan for the child can be achieved without termination of parental rights." N.J.S.A. 30:4C-15.3(a); see N.J. Div. of Youth and Family Servs. v. P.P., 180 N.J. 494, 509 n. 5, 852 A.2d 1093 (2004) (interpreting N.J.S.A. 30:4C-15.3(a) to apply when the Division determines that "adoption is not possible"). And, the Legislature has authorized kinship legal guardianship as an alternative to termination of parental rights in cases where adoption is neither feasible nor likely because the child is in the care of a relative. N.J.S.A. 3B:12A-1(b), -6(d)(3); see P.P., supra, 180 N.J. at 507-08, 852 A.2d 1093.
Neither the Division nor the trial courts should conclude that the Legislature, in prohibiting kinship legal guardianship when adoption is feasible or likely, intended to relieve the Division of its obligation to search for relatives, discourage placement with relatives or prefer placement at the time of removal in the home of a stranger that is willing to adopt a child. If that were the intent, then the Legislature, which is presumed to be familiar with its laws, would have modified the obligation or repealed N.J.S.A. 30:4C-12.1. See Brewer v. Porch, 53 N.J. 167, 173, 249 A.2d 388 (1969). We stress, P.P. only holds that kinship legal guardianship is not an option when relatives are willing to adopt. 180 *201 N.J. at 512, 852 A.2d 1093. It does not hold that the Division should place a child with a foster parent interested in adoption without considering, as required by N.J.S.A. 30:4C-12.1, whether a capable relative is also available.
The Division and the Law Guardian remind us that there is no presumption in favor of placement with relatives; this court has so held and we agree. M.F., supra, 357 N.J.Super. at 528, 815 A.2d 1029. That is beside the point, however, because N.J.S.A. 30:4C-12.1 simply does not permit the Division to embark on a course set for termination of parental rights and adoption by a foster parent without at least first exploring available relative placements.
N.J.S.A. 30:4C-12.1 should be understood in accordance with its plain meaning and purpose, which is prompt identification of relatives and notice to them of the results of the investigation and the potential for termination if the child remains in foster care. So understood, the Division's compliance with N.J.S.A. 30:4C-12.1 is not in any way inconsistent with the goal of permanency.
In fact, when the Division complies with its obligation to identify and assess relatives, it increases the likelihood of a decision that is in the best interests of the child. With information about relatives, the trial court can assess potential placements that provide permanency for the child without cutting the child off from all family ties, a well-recognized negative collateral consequence of adoption. Marsha Garrison, Why Terminate Parental Rights?, 35 Stan. L.Rev. 423, 469-72 (1983). Specifically, the trial court can consider the possibilities of adoption by a willing relative or kinship legal guardianship if the relative is unwilling to adopt. When the Division does not comply, those options, which are wholly consistent with the best interests of the child, may be lost.
Where, as here, the Division fails to comply with its obligation, the judicial determinations that follow are made without information relevant to the best interests of the child. In M.F., we affirmed a trial judge's determination that a change in placement made because the Division had previously failed to consider whether a relative who was caring for the child's sibling would be an appropriate caregiver justified deviation from the statutory time frame for permanency where placement with that relative was in the best interests of the child. 357 N.J.Super. at 526-28, 815 A.2d 1029. We reasoned that the judge was required to balance, on the facts then known, "the need for a timely resolution" against the requirement of a disposition that is in the best interests of the child. Id. at 527, 815 A.2d 1029.
Our conclusion that the Division violated its statutory obligation in this case should not be misunderstood to provide a last minute defense to termination for a parent who identifies a relative, previously unknown and not reasonably known to the Division, after the guardianship complaint has been filed. Delay of permanency or reversal of termination based on the Division's noncompliance with its statutory obligations is warranted only when it is in the best interests of the child. See ibid.; In re Guardianship of J.R., 174 N.J.Super. 211, 221-25, 416 A.2d 62 (App.Div.), certif. denied, 85 N.J. 102, 425 A.2d 266 (1980) (affirming a judgment of guardianship even though the Division failed to provide a parent with visitation, because termination was in the child's best interests).
Our focus in this case is on what the Division should have done but did not do after the child's removal, namely contact the maternal grandparents who were caring *202 for K.K.W.'s siblings, and its relevance to the judge's decision that termination is in K.K.W.'s best interests. The trial judge noted, and we agree, that P.L.J. played a role in the Division's decision to refrain from reaching out for the maternal grandparents who had custody of P.L.J.'s older children. But N.J.S.A. 30:4C-12.1 does not limit the Division's obligation to the relatives the parents want the Division to contact, and wisely so. The parent is presumably not capable of or willing to act in the child's best interests at the time of removal; removal is appropriate only when the child requires care and supervision by the Division because the child's parent is incapable or unwilling. N.J.S.A. 30:4C-12.
We do not suggest that the Division has an obligation to search the fifty states or even the twenty-one counties to identify a parent's siblings, cousins, uncles and aunts. Nor do we suggest that a parent can expect the Division to locate a relative with no information or, as noted above, wait until the eve of the guardianship trial to identify a relative who is willing to adopt. We simply hold that the Division's statutory obligation does not permit willful blindness and inexplicable delay in assessing and approving or disapproving a relative known to the Division, especially one whom the Division knows has custody of the child's siblings.
This case involves circumstances that cannot be dismissed by focusing on absurd exaggerations of the burden on the Division. Here, the Division knew that the maternal grandparents had custody of K.K.W.'s siblings, and the Division knew the grandparents address before K.K.W. was released from the hospital and placed with St. Clare's. According to the caseworker, P.L.J. had even advised that her parents had tried to see the baby. Other relatives identified nearly a year before trial were apparently not assessed and ruled out. We refer, for example, to the Division's complete lack of information about a relative of P.L.J.'s in South Carolina that a judge ordered the Division to assess in June 2009, and the fact that the Division subsequently advised the judge that it had complied with the order.
In this case, the Division's failure to meet its obligation had ramifications relevant to K.K.W.'s best interests. The various judges who handled this case were deprived of any meaningful opportunity to make an informed decision as to whether the placement was in the child's best interests.
While the "reasonable efforts" required of the Division before termination are efforts to rectify conditions that led to the child's removal, in our view, assessment of relatives is part of the Division's obligation to consult and cooperate with the parent in developing a plan for appropriate services that reinforce the family structure. N.J.S.A. 30:4C-15.1(c)(1). The Division is not required to file a petition for termination of parental rights if it has been unable to provide services it deems necessary for the safe return of the child, N.J.S.A. 30:4C-15.3(c), and the Division should not proceed when it has not met its obligation to assess a relative, especially one who is caring for the child's siblings.
In this case, the Division's failure to comply with N.J.S.A. 30:4C-12.1 played a role in the judge's decision that termination is in K.K.W.'s best interests as defined in N.J.S.A. 30:4C-15.1(a)(1)-(4). The judge's decision was based, in part, upon a finding of the harm that K.K.W. would suffer if separated from Mrs. T. The experts, however, agreed that K.K.W. would not suffer serious and enduring harm if she were placed with an adult capable of mitigating that harm. Moreover, the expert upon whom the judge relied had recommended *203 assessment of other parental figures who could mitigate that harm and that had not been done. The judge also considered the harm of separation from Mrs. T. when he determined that termination of parental rights would not do more harm than good.
We reverse and remand for further proceedings to permit the judge to reconsider termination with additional information pertinent to his findings on the second and fourth prongs of the statutory standard. Because the judge ordered continued visitation during the pendency of this appeal, records of that visitation as well as the contact K.K.W. has had with her relatives and the status of K.K.W.'s relationship with Mrs. T. should be considered.
Reversed and remanded for further proceedings. We do not retain jurisdiction.
NOTES
[1] We use the term maternal grandparents, but note that they are P.L.J.'s father and stepmother.
[2] According to the maternal grandmother, when she called about visiting the baby, she was told that the baby was not in the hospital.
[3] K.L.W.'s brief asserts that he identified a cousin living in South Carolina as a potential caregiver in April 2008, and that the Division failed to commence an investigation of that relative until June or July 2009. The citations to the record provided in his brief do not support those assertions. The relative K.L.W. identified in April 2008 had phone numbers with area codes in New Jersey. The order entered on June 23, 2009, upon which K.L.W. relies and the transcript of proceedings on July 23, 2009, and November 19, 2009, establish that the South Carolina resident under consideration was P.L.J.'s "relative," not K.L.W.'s cousin.
[4] The caseworker's notes do not reflect that conversation. Instead the note states that in the opinion of the cousin's social worker, he would not be able to handle caring for K.K.W. and the fifteen-year-old child.
[5] On appeal, the Division does not advance that argument. Instead, the Division contends that we should extend the doctrine of invited error and preclude P.L.J. from seeking reversal based on a course of conduct she urged the Division to take. That argument is so lacking in merit that it does not require discussion in a written opinion. R. 2:11-3(e)(1)(E).