# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5292-17T3

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

M.S.,

     Defendant-Appellant,

and

J.H.,

     Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF J.M.H.,

     a Minor.

_____

Argued January 15, 2019 – Decided February 13, 2019

Before Judges Fisher, Suter and Firko.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Mercer County, Docket No. FG-11-0015-18.

Jennifer M. Kurtz, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Jennifer M. Kurtz, on the briefs).

Julie B. Colonna, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Julie B. Colonna, on the brief).

Linda V. Alexander, Designated Counsel, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Linda V. Alexander, on the brief).

PER CURIAM

M.S. (Mona)[1] appeals the Judgment of Guardianship that terminated her parental rights under N.J.S.A. 30:4C-12. Mona contends the judgment lacked sufficient evidence, concluded erroneously that termination would not do more harm than good and was entered without considering reasonable alternative caretakers. We reject these arguments and affirm.

I.

---

[1]  We use fictitious names to protect the confidentiality of the family members and children. R. 1:38-3(d)(12).

Mona and J.H. (Joe) have one child, J.M.H. (Jane), who was born in March 2016. Mona has two older children, J.S. and I.S. Their father, R.W., is not a party. Under a consent order in a separate case in the Family Division, the two older children live with Mona's mother, J.S. (Jackie), who has residential custody of them.

This appeal concerns Jane. In May 2016, the Mercer County Prosecutor's Office contacted the Division of Child Protection and Permanency (Division), reporting that shortly after Jane's birth, two nurses heard Mona screaming and found Joe trying to strangle her in the hospital room.[2] Mona denied this to the Division's caseworker, insisting that hospital personnel saw Joe giving her a massage. She refused to request a restraining order.

Jane was born prematurely at twenty-five weeks gestation with lung congestion, seizures, and developmental delays. The hospital reported Jane likely was born prematurely due to "placenta abruption." Mona said this was "due to me and my baby daddy . . . fighting all the time."

Jane was in the hospital for three months after her birth. Mona's visitation with her was not consistent. She did not complete training on the apnea machine

---

[2] This was not the first referral to the Division about Mona, but the others in 2012, 2013 and earlier in 2016, all were closed either as unfounded or not established.

required for Jane's breathing. She did not purchase Jane's medication or an appropriate crib, stroller or car seat. Mona did not come to the hospital when Jane was discharged in June 2016.

The Division was granted custody, care and supervision of Jane. She was placed in a nonrelative foster home immediately after her discharge from the hospital where she still resides.

Mona was referred by the Division for a substance abuse evaluation, a psychological evaluation, and domestic violence counseling. She enrolled herself in a parenting program. She had weekly supervised visitation with Jane, that she regularly attended through December 2016. She secured housing and was employed. Her psychological evaluation showed she needed parental skills training classes, domestic violence counseling, psychotherapy and counseling, which she obtained at Children's Home Services (CHS).

In October 2016, Mona applied for and was granted a domestic violence restraining order against Joe because he was scheduled to be released from jail. However, she dismissed it in December 2016 to resume a relationship with him. In March 2017, a caseworker also saw Joe use a key to enter Mona's apartment. Shortly after, Mona called the police complaining that Joe choked her until she

could not breathe. She showed visible injuries; the police arrested Joe but Mona declined to apply for a restraining order.

Mona was no longer employed by this time. Her visits with Jane were sporadic. Between August and October 2017, she attended only three visitations with Jane. She did attend a program for domestic abuse, but returned to Joe while attending it. She failed to comply with updated substance abuse evaluations to monitor her for alcohol abuse. Mona stopped visitation with Jane in October 2017 and did not see her again until April 2018. She was terminated from the CHS program in December 2017 for non-compliance. She did not remain in contact with the Division. The Division's complaint for guardianship was filed in September 2017.

The Division explored options for placing Jane with maternal or paternal relatives. Mona's sister, A.S. (Amy), contacted the Division two weeks after Jane's birth, offering to care for the child.[3] In August 2016, Mona told the Division she wanted Amy to be assessed as a placement for Jane. A week later, Mona changed her position after learning the Division was exploring a paternal aunt, S.Y. (Sylvia), as a possible resource. Sylvia lived in New Jersey; Amy

---

[3] The timing is uncertain because the prosecutor's referral of this matter to the Division was in May 2016, almost two months after Jane was born.

lived in North Carolina. The Division's records indicated placement with Amy was raised again in November 2016, but Mona did not want Jane to go there. This was during the period when reunification with Mona remained the goal. In April 2017, Amy advised the Division that she "was not willing to move forward with the [interstate] process."

Amy contacted the Division again in September 2017. She advised she had not presented herself earlier as a resource because of the distance to North Carolina. She told the Division she kept asking Mona and eventually Mona said "yes" to her requests. The Division commenced the interstate evaluation process through North Carolina at the end of September 2017. At one point in December 2017, Mona left a message for the Division worker, stating that she wanted to surrender her parental rights to Amy. In January 2018, the Division followed up with North Carolina and Amy about Jane's placement. When this case was tried in June 2018, Amy was on her "last look" by North Carolina, meaning she could be certified as a foster parent once she passed its evaluation.

The Division had contacted Mona's mother, Jackie, in June 2016. She did not want to care for Jane. She already was residential custodian for Mona's two other children. She became irate and abusive and hung up the phone on the caseworker. In April 2017, Mona requested that her mother be considered for

6

placement but the Division did not place Jane there because the Division's records reported Jackie had a "substantiation history."

The Division also contacted Joe's mother but she was unable to care for Jane. She suggested her daughter Sylvia but Joe had listed Sylvia's address as his residence upon his release from jail. Mona told the Division she did not want it to continue exploring Sylvia as an option for Jane's placement. Mona wanted Jane to remain with the resource family until reunification because Jane had a bond with them. Sylvia was later ruled out because she already had a relative child in her care and was in the process of becoming a licensed resource parent for that child. Jane's current resource parents remain committed to adopting her.

The guardianship trial was conducted in June 2018. By then Jane had resided with the resource family for two years. Dr. Janet Eig, Psy.D., testified at trial that she performed psychological and bonding evaluations. She diagnosed Mona with post-traumatic stress disorder due to trauma and a borderline personality disorder given her "pattern of intense volatile relationships, her engagement in self-harming behaviors [and] her mood instability . . . ." She had an alcohol use disorder in early remission. Mona suffered from anxiety, depression and had made suicide attempts.

A-5292-17T3

Dr. Eig testified Mona was not able to independently care for Jane. She lacked the ability to nurture or provide for the child, there were "protection" issues because of her volatile relationship with Joe, she did not provide good guidance, had trouble managing her anger and had a history of involvement "in intense and volatile relationships." Mona had not completed any therapy, meaning she had not addressed her "anger problems, past trauma" nor things that contributed to her "mental health problems." She also did not want to talk to anyone about these issues. She could not keep a calm environment for the child because of anger management problems. Her inconsistent visitation affected Jane's ability to develop a relationship with her. Jane needed a lot of "focus, concentration and the ability to manage stress," but Mona had a low frustration tolerance. She was easily distracted.

Dr. Eig testified that Jane's attachment to Mona was "insecure and detached." There was "not a significant psychological attachment or bond between the two of them." However, Jane had a "very secure attachment with the resource parents." Dr. Eig testified Jane would suffer significant harm if separated from her resource parents; Mona was not capable of mitigating this harm.

Dr. Eig, who also evaluated Amy, testified that she might be able to mitigate the harm to Jane if she were removed from her resource parents, but Amy had not met Jane before the bonding evaluation. She would have to have "regular . . . therapeutic visitation" for a relationship to develop, which would be difficult because she lived in North Carolina. She stated it would be "detrimental" to move Jane from her resource parents because of her "very secure attached relationship" with them. Jane was "thriving" in the resource home.

She testified Jane's safety, health, or development had not been endangered "at this point" but that Jane's premature birth resulting from abuse was harm her father had caused. Mona was unwilling to engage in treatment, placing Jane at risk of harm.

Following a two-day trial that Mona did not attend, the trial court terminated Mona's parental rights to Jane. The court found that Mona demonstrated "poor insight and judgment" in protecting Jane from domestic violence. Her conduct caused Jane to suffer harm and placed her at risk of harm. Mona would not obtain a restraining order, did not have stable housing, nor did she undergo training to care for Jane's conditions. She later obtained a

restraining order but then dismissed it. Mona persisted in her relationship with Joe despite domestic violence services.

Mona's visitation with Jane was inconsistent, particularly after March 2017. Mona was terminated from the parenting skills program. Dr. Eig testified about Jane's insecure attachment to Mona and the harm to Jane if she were removed from her resource parents to whom she was securely bonded. Mona could not mitigate this harm. The court found that based on the parents' "failure to remediate their serious domestic violence and mental health issues, comply with required visitations, and successfully complete the majority of court-ordered services," Jane's safety, health or development "has been or would continue to be endangered by a parental relationship with [either parent]."

The court found Mona was unwilling or unable to eliminate these harms. She did not address her "toxic relationship" with Joe. She defended him and declined to maintain a protective order. Her visitations with Jane were inconsistent and she was terminated from that program. She returned to her relationship with Joe even after attending domestic violence counseling. The judge found it unlikely that either parent was capable of providing the care and supervision Jane needed. Mona was not capable of parenting Jane

10

independently. The court concluded there was no reason to delay placement because neither parent could provide a safe and stable home for Jane.

The court found the Division made reasonable efforts to provide services and to consider other alternatives to termination. Her visitation was inconsistent and was terminated. She sporadically attended the parenting program and was terminated. She was inconsistent in attendance at the therapeutic treatment program.

The court also found the Division evaluated several different potential caregivers. Sylvia was ruled out because she had another "relative child in her care and was still going through the process of becoming a licensed resource caregiver." Also, Joe gave her address for his residence. The maternal grandmother was ruled out because she had a prior history with the Division and was not willing to be a caretaker. Mona went back and forth on placing the child with her sister Amy because of the distance to North Carolina.

The court found that termination of Mona's parental rights to Jane would not do more harm than good. Jane lacked a strong bond with Mona; she never resided with her. For a bond to develop, Mona would have to attend therapeutic visitation and re-engage services. However, Mona lacked the focus necessary to parent Jane, at least without appropriate therapy. In contrast, Jane had a

significant or positive bond with her resource parents and would suffer harm if this bond were terminated. Mona could not mitigate the harm to Jane if this bond were disrupted.

Amy had no bond with Jane. To mitigate any harm to Jane by removing her from her resource parents, Amy would need weekly therapy, which would be a long difficult process because she resided in North Carolina. The court concluded that termination of parental rights was in Jane's best interest because all four prongs of N.J.S.A. 30:4C-15.1(a) had been proven by clear and convincing evidence.

Defendant argues on appeal that termination of her parental rights was in error. She raises the following issues:

> I. THE TRIAL COURT ERRED IN CONCLUDING THAT REASONABLE ALTERNATIVES TO TERMINATION OF PARENTAL RIGHTS WERE CONSIDERED AND PROPERLY RULED OUT BECAUSE DCPP FAILED TO TIMELY ASSESS AND PLACE THE CHILD WITH AVAILABLE RELATIVE CARETAKERS.
>
> II. THE TRIAL COURT'S CONCLUSION THAT JANE'S SAFETY, HEALTH OR DEVELOPMENT WAS ENDANGERED WAS ERRONEOUS BECAUSE IT STEMMED FROM THE LEGALLY ERRONEOUS ASSUMPTION THAT J.H.'S PAST ASSAULTS ON M.S. DEMONSTRATED HARM TO JANE AND RELIED UPON FACTS FOR WHICH

A-5292-17T3

THE RECORD LACKED CLEAR AND CONVINCING EVIDENCE.

III. THE TRIAL COURT'S CONCLUSION THAT M.S. WAS UNABLE TO CARE FOR JANE WAS BASED UPON SPECULATION AND ISSUES THAT WERE NOT IDENTIFIED BY DCPP UNTIL A MERE TWO MONTHS BEFORE TRIAL, AND ITS CONCLUSION THAT JANE REQUIRED PERMANENCY WITH THE [FOSTER PARENTS] WAS A DIRECT PRODUCT OF DCPP'S BLATANT DISREGARD OF RELATIVE CARETAKERS.

IV. THE TRIAL COURT'S LEGAL CONCLUSION THAT TERMINATION OF PARENTAL RIGHTS WILL NOT DO MORE HARM THAN GOOD WAS ERRONEOUS BECAUSE IT NEEDLESSLY DESTROYED THE CHILD'S FAMILIAL TIES WHEN RELATIVES WERE WILLING AND ABLE TO CARE FOR THE CHILD BUT ABJECTLY IGNORED BY DCPP.

II.

N.J.S.A. 30:4C-15.1(a) authorizes the Division to petition for the termination of parental rights in the "best interests of the child" if the following standards are met:

> (1)  The child's safety, health or development has been or will continue to be endangered by the parental relationship;
>
> (2)  The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm.

13

Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) The Division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

A trial court's decision to terminate parental rights is subject to limited appellate review. N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007); see Cesare v. Cesare, 154 N.J. 394, 413 (1998) ("Because of the family courts' special . . . expertise in family matters, appellate courts should accord deference to family court factfinding."). The family court's decision to terminate parental rights will not be disturbed "when there is substantial credible evidence in the record to support the court's findings." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008).

Because we find that the trial court's findings are supported by adequate, substantial and credible evidence in the record, we affirm for the reasons set forth in the trial court's forty-eight page written decision. We add only these brief comments.

We are satisfied the trial court correctly determined that there was clear and convincing evidence to support each prong of the best interest test. There was harm to Jane. Mona visited inconsistently with Jane and then voluntary withdrew from her life and any responsibilities for her care. She has never provided any care for her special needs child. It is not rebutted that her bond with Jane is insecure and not developed because of her lack of interaction with Jane. There was nothing in the record to dispute that Mona lacks the ability or inclination to overcome her limitations and become a responsible parent. She did not engage in therapeutic visitation; she admitted she does not like to talk to anyone and would not engage in meaningful therapy to address her psychological problems. She does not dispute she was provided with adequate services, but she showed no improvement. She continued her "toxic" relationship with Joe. She did not complete parenting classes or therapy.

Defendant's contention the Division made "no effort" to place Jane with one of the relatives under consideration is without merit. In N.J. Div. of Youth & Family Servs. v. K.L.W., 419 N.J. Super. 568, 580 (App. Div. 2011), we said that the Division should not "place a child with a foster parent interested in adoption without considering, as required by N.J.S.A. 30:4C-12.1, whether a capable relative is also available." We also said "there is no presumption in

favor of placement with relatives . . . ." Ibid. "Rather, '[a] presumption of custody only exists in favor of a natural parent as opposed to placement with relatives or foster parents.'" N.J. Div. of Youth & Family Servs. v. J.S., 433 N.J. Super. 69, 82 (App. Div. 2013) (quoting N.J. Div. of Youth & Family Servs. v. M.F., 357 N.J. Super. 515, 528 n.3 (App. Div. 2003)).

The Division explored other relatives where Jane might be placed. The paternal aunt, Sylvia, was ruled out because she had a relative child in her care and was still in the process of becoming licensed as a resource parent. The maternal grandmother, Jackie, was already raising two other children and did not want to raise Jane. Amy was out of state and had no relationship with Jane. Mona went back and forth about placing Jane with Amy. While reunification efforts were underway, the Division appropriately considered in-state options. It commenced the interstate review thereafter. Even if a relationship could be developed, there was no certainty that Amy could mitigate any harm caused by disrupting the relationship with Jane's resource parents. In re Guardianship of D.M.H., 161 N.J. 365, 379 (1999).

We are satisfied on this record that the trial judge appropriately applied the best interests standards under N.J.S.A. 30:4C-15.1 in terminating Mona's parental rights.

A-5292-17T3

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-5292-17T3