# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3689-18T3

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

L.N.G.,

     Defendant,

and

N.R.,

     Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF K.R.
and K.R.,

     Minors.

_____

Submitted January 30, 2020 – Decided March 12, 2020

Before Judges Alvarez and DeAlmeida.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FG-04-0115-19.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender, of counsel; Robert W. Ratish, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jane C. Schuster, Assistant Attorney General, of counsel; Ashley L. Davidow, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Nancy P. Fratz, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant N.R. (Tom)[1] and L.N.G.[2] (Mary) had two children, K.R. (Robert), born June 2016, and K.R. (James), born November 2017. They resided as a family with Mary's two older children J.G. (Michael) and N.G. (Susan). Susan died on July 18, 2017, from severe injuries as a result of a physical assault. Tom was charged with the four-year-old's killing and was pending trial when the guardianship proceedings filed by plaintiff the Division of Child Protection

---

[1] We protect the family's anonymity by use of pseudonyms pursuant to Rule 1:38-3(12).

[2] L.N.G. surrendered her parental rights mid-trial and is thus not involved in the appeal.

and Permanency (Division) moved forward. During the assault, two of Susan's teeth were knocked out, and her blood splattered the apartment hallway, bathroom door, and bathtub. Mary later reported that Tom told her if she called police, her "whole life would be f----d up." The assault occurred some two days before Mary called 911 after discovering Susan's unconscious body on the floor. When the homicide occurred, Tom had been restrained from contact with Mary or the children. Mary entered a guilty plea to second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a), involving Susan's death.

Tom now appeals the April 12, 2019 termination of his parental rights. We affirm. He alleges the following errors:

> POINT I:
> THE TRIAL COURT ERRED IN FINDING THAT [THE DIVISION] EXPLORED ALTERNATIVES TO TERMINATION OF PARENTAL RIGHTS BECAUSE THE DIVISION DID NOT FULLY INVESTIGATE [Tom's] MOTHER AS A POTENTIAL PLACEMENT FOR THE CHILDREN.
>
> POINT II:
> THE TRIAL COURT ERRED IN FINDING THAT TERMINATION OF PARENTAL RIGHTS WILL NOT DO MORE HARM THAN GOOD BECAUSE THE DIVISION HAS NO ADOPTIVE HOME FOR [Robert], AND THE COURT DID NOT CONSIDER THE RELATIONSHIP BETWEEN THE SIBLINGS AND THE DAMAGE THAT WOULD RESULT IF THE CHILDREN LOST THEIR FAMILY CONNECTIONS.

## I.

We first address Tom's second point, that the trial court erred in its assessment of the fourth prong of the statutory test, that "[t]ermination of parental rights will not do more harm than good."  N.J.S.A. 30:4C-15.1(a)(4). The basis for Tom's contention is that Michael and Robert, who were placed together since Susan's death, will be separated because the Division had to explore a select home adoptive placement for Robert.  That is no longer the case. The Division has reported, pursuant to Rule 2:6-11(f), that the boys have been placed together in a preadoptive home.  The argument is moot and does not require additional discussion.

## II.

The third prong of the guardianship statute requires the Division to consider "alternatives to termination of parental rights . . . ."  N.J.S.A. 30:4C-15.1(a)(3).  Tom's principal allegation is that the Division did not sufficiently explore alternatives to termination because it did not adequately investigate Tom's mother (Barbara) nor complete its investigation of several other family members that he and Mary suggested as possible placements.

Once children become the responsibility of the Division, it is statutorily obligated to search for family members "willing and able to provide the care and

A-3689-18T3

support required by the child." N.J.S.A. 30:4C-12.1(a). We combine our discussion of the trial court's decision, the relevant circumstances found in the record, and applicable precedents into one discussion.

In her termination decision, the trial judge noted that Barbara testified she was interested in adopting the children, not in kinship legal guardianship (KLG). As we said in New Jersey Division of Youth & Family Services v. K.L.W., 419 N.J. Super. 568, 581 (App. Div. 2011), the Division must balance "'the need for a timely resolution' against the requirement of a disposition that is in the best interests of the child." (quoting N.J. Div. of Youth & Family Servs. v. M.F., 357 N.J. Super. 515, 527 (App. Div. 2003)). The best interests may, however, require investigation into placement with family members thus delaying the completion of guardianship proceedings. In this case, the Division did conduct an investigation of Barbara, and when ordered to reassess her after her appeal of the issuance of a rule-out letter, did so. The Division was unable to complete the home inspection at Barbara's own request because she claimed she was getting a bigger apartment and wanted to wait until then.

The judge found, as supported by the record, that when the Division was initially involved with the family, Barbara was barred from meetings between Mary and Division workers because Barbara was highly defensive of her son

5

and would dominate the conversation over Mary. Barbara denied the extent of her son's violent character, even on the stand after the killing, although she ultimately admitted having been aware of his problems. Barbara also denied that she had ever struck Susan with a belt, contrary to Susan's recorded interview statement taken before her death.

The judge also observed that before James's birth, the Division met with Mary, Barbara, and Tom's cousin A.B. The Division informed the women that it planned to take custody of James, who was born after Susan's killing. Despite being forewarned, or perhaps because of it, Mary delivered the baby in a Philadelphia hospital, and attempted to transfer custody to A.B. in a New Jersey courthouse. When asked about the baby's whereabouts at that time, neither she nor A.B. would respond. Barbara also denied knowing where the baby could be found, although she admitted being present at the child's birth. Eventually, James was located in A.B.'s home.

The judge characterized Barbara's testimony as incredible. The judge described her as evasive, having "a selective memory," and inconsistent in her testimony about specific events. The judge, limiting her discussion to Michael and Robert, despite her stated reservation about Barbara, made no specific

finding that the children were at risk if placed with her. This allowed the Division to continue its investigation into her home.

The judge noted that when the workers went to Barbara's home to attempt to reinvestigate after the rule-out letter was overruled, Barbara said that there was no point entering because she planned to move somewhere larger so that she could take the boys into her home. In other words, at the time of the termination hearing, the investigation was delayed due to Barbara's failure to obtain housing that would meet the children's needs.

We hasten to add that our discussion of this point does not apply to James. James has been in the same resource home, with a family who wishes to adopt him, since birth. According to the Division's expert, James is bonded to that parent, although no comparative evaluation could be made because Tom was restrained from contact with the children. Tom has never met James. James is not specifically mentioned in Tom's brief as one of the children whose best interests would not be served by termination; it refers to only Robert with regard to relative placement.

That parents name relatives for possible placement should not prevent guardianship proceedings from going forward. K.L.W., 419 N.J. Super. at 582. There were a number of relatives whom the Division explored; the trial judge

touched upon each of those names in her decision. The disposition as to each did not involve a rule-out letter—but that is not necessary in all circumstances. In this case, the Division attempted to contact relatives of both Tom and Mary, but these were individuals who were either ruled out because of issues such as domestic violence within the home, were nonresponsive, refused, or for other reasons the investigation could not continue.

Barbara wished to adopt the children, at least in part because she wanted to raise them free from contact with the Division. That means the guardianship proceedings need not be halted. See N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 512-13 (2004) (holding that KLG should only be considered when adoption is not an option); N.J. Div. of Youth & Family Servs. v. T.I., 423 N.J. Super. 127, 130 (App. Div. 2011) ("[W]hen a caregiver in a case brought by the [Division] unequivocally asserts a desire to adopt, the finding required for a KLG that 'adoption of the child is neither feasible nor likely' cannot be met.").

There is no question that family placement is a more desirable alternative, all factors being equal, but is not a presumption. K.L.W., 419 N.J. Super. at 580. K.L.W. instructs that the Division must not be willfully blind or inexplicably delay reviewing a relative known to the Division, especially one who has custody of the child's siblings. Id. at 582. In that case, the Division

8

did not investigate the children's maternal grandparents for placement at the request of the children's mother. Id. at 571. However, she eventually asked the Division to consider her parents for placement, and the Division did not act, inconsistent with the best interests of the children. Id. at 573-74, 581.

In this case, Barbara's interactions with the Division before Susan's death were problematic. K.L.W. states: "reversal of termination based on the Division's noncompliance with its statutory obligations is warranted only when it is in the best interests of the child." Id. at 581. Even if Tom's point that the Division failed to meet its statutory obligation had merit, which it does not, Barbara's decision to refuse a home inspection—and failure to thereafter obtain appropriate housing so it could be completed—should not have halted the termination of parental rights. To have done so would not have been in the children's best interests. The decision in this case was not premature.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-3689-18T3