# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4722-18T3

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

     Plaintiff-Respondent,

v.

M.A.M.R.,

     Defendant-Appellant,

and

R.J.C.M.,

     Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF M.A.M., JR.,
and J.A.M.,

     Minors.

_____

Submitted February 10, 2020 – Decided February 27, 2020

Before Judges Sabatino and Natali.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FG-07-0056-18.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender, of counsel; Ruth Ann Harrigan, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jane C. Schuster, Assistant Attorney General, of counsel; Fatime Meka, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor M.A.M., Jr. (Meredith Alexis Pollack, Deputy Public Defender, of counsel; Danielle Ruiz, Designated Counsel, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor J.A.M. (Meredith Alexis Pollack, Deputy Public Defender, of counsel; Margo E.K. Hirsch, Designated Counsel, on the brief).

PER CURIAM

In this Title 30 guardianship case, M.A.M.R. (Michael),[1] the father of M.A.M., Jr. (Mark) and J.A.M. (John), appeals from a Family Part order terminating his parental rights claiming that the Division of Child Protection and Permanency (Division) failed to establish clearly and convincingly prongs three and four of the statutory best interests of the child test. The Law Guardians and

---

[1] We use pseudonyms to protect the identities of the parties. R. 1:38-3(d)(12).

the Division urge that we uphold the trial court's decision. Mark and John's biological mother, R.J.C.M. (Rita), does not appeal the termination of her parental rights. We affirm substantially for the sound reasons detailed in Judge James R. Paganelli's fifty-six-page written opinion issued at the conclusion of the trial.

I.

Michael is the biological father of Mark, born August 2005, and John, born October 2007.[2] The Division had already provided services to the family since 2003 when it learned that Rita left Maureen and Audrey with their maternal grandmother without returning, failed to take them to their scheduled medical appointments, and reported to the Division that she was homeless. In 2007 and 2008, the Division also received multiple referrals because of physical injuries to Maureen, resulting in Michael's incarceration and a substantiation of abuse by the Division.

In 2009, the family relocated to Puerto Rico without notifying the Division. The Division received a call from the local child protective services

---

[2] Michael and Rita had four other children: M.M. (Maureen), born September 2001; A.J.M. (Audrey), born October 2002; J.M. (Jessica), born August 2004; and A.M. (Ann), born August 2006. These children are not involved in the current appeal, but information as to Michael's care for them is provided for context and because it is relevant to the issues under review.

A-4722-18T3

agency there when Rita burned Jessica and Mark on their mouths with a hot spoon and Michael failed to take any preventive action. Both Michael and Rita were convicted of offenses related to the incident, and all children were removed from the family's care. Mark and John were placed with their paternal aunt in Ohio, and the remaining children were placed with other family members.

In 2015, the court terminated Michael and Rita's parental rights to Jessica and Ann who were subsequently adopted. The Division received another referral in 2015 concerning Maureen and Audrey because their paternal grandmother placed them back with Michael. The Division subsequently obtained custody of Maureen and Audrey after the court concluded that Michael abused or neglected them. Michael and Rita then completed identified surrenders of their parental rights as to Audrey and the Division placed Maureen in a residential facility with a goal of long-term care.

At that time, Michael was married to L.O. (Laura) who had three children of her own. Laura had an open case with the Division and was referred for a psychological evaluation. She was recommended for individual counseling and couples counseling with Michael. In 2016, the Division referred Michael, Laura, and Rita to Frank J. Dyer, Ph.D., for additional psychological evaluations.

In August 2017, Laura informed the Division that she separated from Michael. Laura also stated that Mark and John's paternal aunt brought Mark and John back to New Jersey and placed them with her because she could no longer care for either child. The trial court awarded the Division custody of Mark and John who were then placed in a resource home as the paternal aunt improperly transferred custody of the boys to Laura with only a notarized letter.

The Division proposed a family team meeting with Michael, Rita, Mark, and John, but neither Michael nor Rita accepted the request. The Division also offered visitation, which both attended, but Michael's attendance was notably "more sporadic."

The Division ultimately filed a guardianship complaint for Mark and John in November 2017, and the trial court approved the Division's permanency plan of termination of parental rights followed by adoption. Thereafter, both Michael and Rita entered identified surrenders of the boys to their resource parent, and the court entered a conforming guardianship order.

By May 2018, however, the Division received calls "almost daily . . . about the boys' behaviors" indicating that the children were destroying the residence. The court accordingly removed both Mark and John from the resource parents' care and vacated the judgment of guardianship. The Division then successfully

moved to be relieved of its obligation to provide reasonable efforts to reunify the children with Michael and Rita as their parental rights to Jessica and Ann had been terminated.  See N.J.S.A. 30:4C-11.2(a)(3).

The Division unsuccessfully attempted to contact Michael after the judgment of guardianship was vacated.  When they finally reached him two months later, the Division offered him visitation, but he did not stay in contact with the Division and did not see Mark and John until a bonding evaluation in January 2019.  After the bonding evaluation, Michael visited Mark and John only one additional time.

Thereafter, the Division ruled out a maternal aunt and Laura as placements for Mark and John.  According to Division records, Laura was ruled out due to inadequate space in her residence and her inability to assure the Division that Michael would not have unsupervised contact with the boys.  The trial court again accepted the Division's plan of termination of parental rights followed by adoption for Mark and John and held the guardianship trial on May 7 and May 21, 2019.

At trial, the Division presented extensive documentary evidence, the testimony of a caseworker and an adoption unit supervisor who testified as to the Division's history with the family, and the expert testimony of Dr. Dyer.

Judge Paganelli found all three witnesses to be credible. In particular, he noted that the caseworker "provided detailed and knowledgeable testimony . . . [and] made eye contact with all questioners." As to the adoption unit supervisor, the judge noted that she "was particularly well versed regarding the Division's efforts in terms of the select home . . . [and] adoption matters." Finally, as to Dr. Dyer, Judge Paganelli found that his uncontroverted testimony was "thorough, detailed, and informative," he was "fully conversant with the facts," and he "made eye contact with all questioners and was not defensive on cross-examination." Michael neither testified nor presented any witnesses or documentary evidence.

Dr. Dyer testified that his first impression of Michael was that he "had a tendency to engage in very abrasive and conflicted intimate relationships," and that Michael's "entire presentation throughout all the evaluations . . . was character[ized] by a minimization and a denial of any problems, blame or responsibility, and a glib assurance that if the children were placed with him then all of the matters would be resolved without problems." Dr. Dyer also found that Michael "did not possess adequate parenting capacity at the time" based on his "instability and his lack of cooperation with services, [and] no

reason to believe that [Michael] ha[d] undergone any meaningful therapeutic in[ter]vention that might have positively influenced him."

With respect to visitation, Dr. Dyer testified that by the time of the November 2017 psychological evaluations of Mark and John, the boys had not had any contact with Michael since they were transported back to New Jersey from Ohio. Dr. Dyer stated that this lack of parental contact "sends a message to the boys that their birth father is not particularly interested in seeing them" and that "it very strongly indicates that [Michael's] emotional investment . . . in these children is deficient." Dr. Dyer concluded that "every adult who has held themselves out to these boys since their early childhood . . . has wound up rejecting them . . . and for [Michael] to not visit them when he had the opportunity to do so . . . sends a message."

He also noted that Michael's lack of sensitivity was reflective of "a lack of competence with respect to being able to do anything realistic in the way of rectifying these problems or taking adequate care of these children with an acknowledgement or appreciation of their special needs and vulnerabilities" and that returning Mark and John to his care would "pose a very substantial risk to both of [them]." Dr. Dyer stated that this "tendency in [Michael] generally to deny and minimize any problems" suggested that he would likely allow the care

and discipline of the children to fall onto Laura, who was "very poorly equipped to undertake such a challenge with these very aggressive and volatile children."

Dr. Dyer testified that based on the bonding evaluations between Michael, Mark, and John, Michael "is so poorly attuned to these boys and so unresponsive to all of the adverse experiences that they have had and their psychological, emotional and behavioral vulnerabilities that the placement of either or both children into his care would just be setting them up for more of the same." He explained that "[b]ased on the very long hiatus in [their] contact with [Michael] while they were in Ohio . . . and based on [Michael's] spotty visitation with them and ultimately a hiatus of a year in which [Michael] did not go to see these boys," Mark and John "do not have anything that even approaches an attachment to [Michael]."

Dr. Dyer further concluded that "if the children's relationship with [Michael] was terminated they would not experience . . . something that would cause either serious or prolonged emotional harm" and that "based on [Michael's] poor compliance with services and eventually dropping out of services . . . [Michael is] not going to be able to acquire adequate parenting capacity through any type of intervention within the foreseeable future."

Dr. Dyer also testified with respect to his evaluation of Laura. He initially concluded that Michael and Laura together could potentially become a viable parenting plan, with Laura as the primary caregiver. Michael and Laura were reevaluated, however, and Dr. Dyer determined that Laura "would be a negative factor with respect to [Michael's] involvement with these children because of the extreme instability of both their relationship coupled with the fact that they both are unwilling to disclose [their] conflicts." He specifically highlighted that despite being separated, "it's on one day and off the next . . . [and] that, coupled with [Laura's] characteristic dependence and passivity makes for a very troubling prognosis" as he was concerned about "how many separations and rejections and disruptions these two boys are capable of bearing without coming apart completely."

When asked about the consequences for Mark and John if the Division's plan for terminating Michael's parental rights followed by select home adoption[3] was unsuccessful, Dr. Dyer stated that "the likelihood that eventually there will be permanency for these children if they are freed for that purpose . . . overshadow[ed] anything that [Mark and John] could get from continued contact

_____

[3] Select home adoption refers to "a process that includes looking for an adoptive home in New Jersey and registering the child[ren] on the national adoption exchange." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 98 (2008).

with their parents." He noted that Mark and John need "some sort of permanent situation with a caretaker whom they can view as somebody who has ultimate authority . . . [and] responsibility over them, who invests in them and provides them with appropriate stability [and] security" and Michael "does not have that capability" and "is not going to acquire that capability within the foreseeable future." He concluded that if Mark and John were never adopted, "certainly there would be a disappointment, but not anywhere near approaching the disappointment that they experience when they are placed with a caretaker who rejects them or . . . who at one point seemed to be invested in them and then drops out of sight for long periods of time."

On this point, a Division adoption unit supervisor also testified and acknowledged that Mark and John's age, their history of behavior, and current services including Mark's ADHD diagnosis, could be an obstacle to adoption, but she emphasized more extensive adoption options become available after a court terminates a parent's parental rights. Specifically, she stated that "the pool becomes wider . . . [as] [s]ome families . . . feel more comfortable or are more open to dealing with children that are not attached to a litigation process." She also informed the court that at the time of the trial, there was a potential family

11

willing to take Mark and John together, and a separate family willing to take John individually.

After considering all of the evidence, Judge Paganelli concluded that the Division established by clear and convincing evidence all four prongs of the statutory criteria for termination of parental rights under N.J.S.A. 30:4C-15.1(a)(1) through (4). In particular, Judge Paganelli found the Division established: John and Mark's safety, health, and development have been and will continue to be endangered by their parental relationship with Michael, N.J.S.A. 30:4C-15.1(a)(1); Michael is unable or unwilling to eliminate that harm, he is unable to provide a safe and stable home for them, and delaying permanent placement will add to their harm, N.J.S.A. 30:4C-15.1(a)(2); the Division made reasonable efforts to reunify Michael with Mark and John, and considered alternatives to termination of Michael's parental rights, N.J.S.A. 30:4C-15.1(a)(3); and termination of parental rights will not cause Mark and John more harm than good, N.J.S.A. 30:4C-15.1(a)(4).

On appeal Michael challenges only the court's prong three and four findings. As to prong three, he specifically claims the Division failed to provide services that were timely and reasonable, and the court failed to consider alternatives to termination of his parental rights and support its findings by

substantial, credible evidence in the record. He similarly claims the court's prong four findings are deficient as the trial evidence did not clearly and convincingly establish that termination of parental rights would not do more harm than good.[4] We disagree with all of these arguments.

II.

Our scope of review in Title 30 guardianship cases is limited. In such cases, the trial court's findings generally should be upheld so long as they are supported by "adequate, substantial, and credible evidence." N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 552 (2014). The court's decision should only be reversed or altered on appeal if its findings were "so wholly unsupportable as to result in a denial of justice." N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 511 (2004). We must give substantial deference to the trial judge's opportunity to have observed the witnesses first-hand and to

---

[4] As noted, Michael does not contest the court's findings under the first or second prong of the best interests test, and we therefore consider any challenge to the court's findings on those prongs waived. See Pressler & Verniero, Current N.J. Court Rules, cmt. 5 on R. 2:6-2 (2019) ("[A]n issue not briefed is deemed waived."); Telebright Corp. v. Dir., N.J. Div. of Taxation, 424 N.J. Super. 384, 393 (App. Div. 2012) (deeming a contention waived when the party failed to include any arguments supporting the contention in its brief). Despite Michael's waiver, we have nevertheless reviewed the court's prong one and two findings and are satisfied they are supported by substantial, credible evidence in the record and the court's legal conclusions unassailable.

evaluate their credibility. R.G., 217 N.J. at 552. We must also recognize the expertise of the Family Part, which repeatedly adjudicates cases brought by the Division under Title 9 and Title 30 involving the alleged abuse or neglect of children. See, e.g., N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012); N.J. Div. of Youth & Family Servs. v. L.J.D., 428 N.J. Super. 451, 476 (App. Div. 2012).

A.    Prong Three

Turning first to Michael's argument that the Division failed to provide him with reasonable services, we are satisfied that the trial court properly determined the Division made diligent efforts to provide services to Michael and his family since 2003, which included a period of time before Mark and John's birth. As summarized by the court, the list of services offered include: "referral to shelters . . . psychological evaluations, bonding evaluations, visitation (including therapeutic), [family team meetings], board rate, relative assessments, [family preservation services], parenting skills, family therapy, a relative psychological assessment [for Laura], and individual therapy." With respect to Mark and John specifically, the Division provided Michael with psychological evaluations, a bonding evaluation, visitation and bus tickets, a family team meeting, psychological assessments for Laura, and parenting skills.

There is no evidence to suggest that Michael sought or participated in services while in Puerto Rico or when he returned to New Jersey. Indeed, it was not until the end of 2015 that Michael engaged in services and completed a parenting class. When offered visitation with Mark and John prior to executing a voluntary surrender of his parental rights, the Division noted that his attendance was sporadic. Even after learning that Mark and John's judgment of guardianship had been vacated, the Division offered visitation, but Michael did not see the boys until the bonding evaluation in January 2019. Based on Michael's lack of visits up until the January 2019 bonding evaluation, the court ordered him to visit with Mark and John more consistently. Despite the Division being relieved of its obligation to provide reasonable efforts to Michael, the Division still established a visitation schedule for Michael and provided him bus tickets, but Michael only visited Mark and John once in January, once in February, and at no time during March and April of 2019.

The record further reflects that Michael failed to consistently engage in services over the sixteen years that the Division was involved with the family. Contrary to Michael's assertions, the Division's offer of services was timely and more than sufficient under the circumstances in light of his significant unavailability. The failure to remedy the circumstances and conditions that led

to the placement of Mark and John was not a result of the Division's lack of effort, but rather the result of Michael's "failure to cooperate or follow through" with the services that the Division provided. New Jersey Div. of Youth & Family Servs. v. C.S., 367 N.J. Super. 76, 119 (App. Div. 2004).

We also disagree with Michael's argument that the Division failed to adequately consider alternatives to terminating his parental rights. Michael specifically claims that the Division failed to fully explore the option of him and Laura co-parenting Mark and John. We initially note that although the Division has a statutory duty to consider alternative placements, even where a relative has been identified and is an appropriate placement the law does not create a presumption in favor of relative placement. N.J. Div. of Youth & Family Servs. v. J.S., 433 N.J. Super. 69, 82 (App. Div. 2013); N.J. Div. of Youth & Family Servs. v. M.F., 357 N.J. Super. 515, 528-29 (App. Div. 2003). Here, the record clearly indicates that Laura was ruled out as a potential placement because she resided in a two-bedroom apartment with her three children and because she continued her volatile relationship with Michael. There is no evidence that she requested a waiver or appealed the rule-out letter.

Furthermore, the Division provided psychological assessments of Laura and implemented services for her including individual and family therapy.

16

Although Dr. Dyer believed at one point that Michael and Laura could successfully co-parent, that conclusion relied heavily on Laura as the primary caregiver. After their separation, Dr. Dyer concluded that Laura was now "a negative factor with respect to [Michael's] involvement with these children because of the extreme instability of both their relationship coupled with the fact that they both are unwilling to disclose these conflicts." Dr. Dyer was particularly concerned about how many separations, rejections, and disruptions Mark and John were capable of withstanding "without coming apart completely," which the record indicates is a likely scenario based on their troubling history.

Michael also argues the Division violated its obligation by not considering Laura in a KLG arrangement. A kinship legal guardian is "a caregiver who is willing to assume care of a child due to parental incapacity, with the intent to raise the child to adulthood, and who is appointed the kinship legal guardian of the child by the court." N.J.S.A. 3B:12A–2. The kinship legal guardian receives the same rights, authority, and responsibilities as the birth parent; however, the birth parent retains visitation rights, the right to consent to adoption, and the right to consent to a name change of the child. N.J.S.A. 3B:12A-4(a)(1) to (2).

A-4722-18T3

The trial court concluded that "KLG is not an option in the matter at bar because there is no offered guardian." As noted, Laura was ruled out as a potential placement for Mark and John due to space considerations and her ongoing relationship with Michael after their separation. Thus, even if Laura was offered as a guardian, Dr. Dyer testified that placing children with Laura would be potentially harmful due to her wholly unstable relationship with Michael and her inability to protect the children from him. With respect to the care and discipline of the boys, Dr. Dyer particularly noted that Laura was "very poorly equipped to undertake such a challenge with these very aggressive and volatile children."

Given the concerns regarding Laura's relationship with Michael, the potential harm to the children if Michael was exposed to them, and the conclusion that Laura was ill-prepared to provide for the children on her own, it was not error to deny placing the children with Laura in either a co-parenting or KLG arrangement, even if adoption was not yet certain.

B. <u>Prong Four</u>

Michael's argument that there was insufficient evidence to support the trial court's conclusion that termination of parental rights would not do more harm than good is again belied by Dr. Dyer's unrefuted expert testimony. Dr. Dyer

testified that based on Michael's inconsistent engagement in services, he "was not going to be able to acquire adequate parenting capacity within the foreseeable future." He also noted that Michael's lack of sensitivity added up to a "lack of competence . . . [in] taking adequate care of [Mark and John] with an acknowledgement or appreciation of their special needs and vulnerabilities" and returning them to his care would "pose a very substantial risk." With respect to the children's bond with Michael, Dr. Dyer determined that Mark and John "do not have anything that even approaches an attachment to [Michael]," and that "if the children's relationship with [Michael] was terminated they would not experience . . . something that would cause either serious or prolonged emotional harm."

We are also unpersuaded by Michael's final argument that "[a] plan of 'select home adoption' does not provide Mark or John with permanency due to the extent of their behavioral issues, which have resulted in failed placements and a failed adoption" and "leaves them in limbo." As the Division supervisor testified, Mark and John's age, their behavioral history, and current services including those related to Mark's ADHD diagnosis can be an obstacle to adoption, however, select home adoption provides Mark and John with considerably more options for permanency as "the pool becomes wider" and

19

families "feel more comfortable or are more open to dealing with children that are not attached to a litigation process." At the time of the trial, the Division had already identified a potential family willing to take both Mark and John, and a separate family willing to take John individually.

Dr. Dyer additionally testified that the likelihood that Mark and John would be placed in a permanent home if they were freed for adoption "overshadow[ed] anything that [Mark and John] could get from continued contact with their parents." He concluded that if Mark and John were never adopted, there would be disappointment, but not anywhere near approaching the disappointment that they might experience if returned to Michael's care. Thus, the Division established prong four clearly and convincingly as Dr. Dyer recommended terminating Michael's parental rights and pursuing select home adoption despite there not yet being an identified adoptive home for Mark and John. He definitively concluded that Michael had no bond with these children, and it would not harm them to sever the parental bond.

In sum, we discern no basis to set aside Judge Paganelli's well-supported and well-reasoned decision to terminate Michael's parental rights. To the extent we have not addressed defendant's other arguments, we conclude they are

without sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION